Filed 12/15/09          NO. 4-08-0056

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,  )   Appeal from
          Plaintiff-Appellee,          )   Circuit Court of
          v.                           )   Macon County
CHRISTOPHER J. REED,                   )   No. 05CF1248
          Defendant-Appellant.         )
                                       )   Honorable
                                       )   James R. Coryell,
                                       )   Judge Presiding.
_____

          JUSTICE TURNER delivered the opinion of the court:

          In January 2006, the State charged defendant, Christo-

pher J. Reed, with three counts of first degree murder (720 ILCS

5/9-1(a)(1), (a)(2) (West 2004)) for the death of Tywon Renier.

After a September 2006 trial, a jury found defendant guilty of

first degree murder and answered a special interrogatory, indi-

cating the State had not proved beyond a reasonable doubt defen-

dant had personally discharged a firearm that proximately caused

Renier's death.  Defendant filed several posttrial motions, all

of which the trial court denied.  At an August 2007 sentencing

hearing, the court sentenced defendant to 50 years' imprisonment.

Defendant filed a motion to reconsider and reduce his sentence,

which the court also denied.

          Defendant appeals, asserting (1) the jury's negative

answer to the special interrogatory was fatal to its guilty

verdict and (2) the State failed to prove defendant's guilt

beyond a reasonable doubt.  We affirm.

## I. BACKGROUND

In the early hours of August 8, 2005, Renier was shot to death near Bass Place, a club and tavern in Decatur, Illinois. In January 2006, the State charged defendant by information with three counts of first degree murder. The charges specifically alleged defendant used a handgun to shoot Renier without lawful justification and with (1) the intent to kill Renier or (2) the knowledge said act would cause Renier's death or (3) the knowledge that such act created a strong probability of death or great bodily harm to Renier, thereby causing Renier's death.

In September 2006, the trial court held a jury trial on the charges. The following is the evidence relevant to the issues on appeal. Micah Morgan testified he and several of his friends, including Renier, went to Decatur in two vehicles during the Decatur Celebration. Morgan drove his car, a silver Cadillac with Lamborghini-style doors, and Renier's brother, Adrian Thomas, drove a black Aurora with spinners. When they got to Decatur, they drove by the celebration, which was ending, and then went to a drive-thru liquor store. After the liquor store, they went to someone's house for about an hour before heading to Bass Place. Morgan parked his car on the "back street" and stood around outside.

About an hour and a half later, Morgan observed an altercation start to erupt. He witnessed Donte Hendrix punch someone through an open car window. The individual jumped out of the car, and the crowd chased and jumped on the individual.

After the individual got away, Genaro "Leo" Hendrix, Donte's brother, grabbed Donte and started "cussing him out." Renier then hit Leo. Leo responded by hitting Renier three times before the pair was separated. Morgan backed up Renier and told him to leave. When Morgan turned back around, he observed defendant, whom he had never seen before, and Leo whispering. He denied defendant came up and said, "get out of my car." Morgan testified some other individual had said, "get off my car." Morgan then tried to help Donte explain to Leo it was a mistake. Renier was standing three to five feet behind Morgan.

Next, Morgan observed defendant come from behind a van and start shooting. Morgan identified defendant in court as the shooter. Morgan stated he heard at least seven shots fired in rapid succession and was struck by the shell casings. He heard windows breaking and the car being hit. Morgan did not know Renier had been hit until he fell to the ground. When defendant was done shooting, Morgan saw defendant drop the gun and then pick it up again. Defendant then fled the scene. Morgan denied seeing defendant with a second gun. After defendant had run away, Morgan heard Thomas yelling for help with his brother and "more gunshots going back toward[] the street, not toward the main street, toward[] the back street." Morgan helped get Renier in the black Aurora. The Aurora and another car that belonged to the group, a Pontiac, sustained damage during the shooting.

Morgan testified he did not talk to the police that night because he had a "mistrustful relationship" with them. He

- 3 -

also did not talk to the police when he was arrested three weeks after the incident on unrelated charges. He explained it was "just the world we live by out there." In January 2006, Morgan gave a statement to Detective Frank Hubbard. Morgan indicated he had decided to talk because he was upset with defendant. Morgan had shared a cell with defendant in the Macon County jail for less than 24 hours. Only a few words were exchanged about the incident, but defendant had asked Morgan to write a statement indicating defendant was not at Bass Place at the time of the incident. Morgan further testified the "Squad" and "Young Money" were Springfield gangs that fight amongst each other. Morgan denied he and the victim were members of Young Money. Morgan also stated the victim had a tattoo of the word "squad," which the victim and several friends had gotten after a friend's death.

Morgan acknowledged he had a misdemeanor conviction for cannabis possession and four pending cases in Sangamon County. He further testified he had been charged in Macon County with attempt (murder), aggravated discharge, and unlawful use of a firearm. As to the latter charges, Morgan had been released on a recognizance bond and filed a speedy-trial demand. He denied his release on the recognizance bond was subject to him giving a statement to police. The State later dismissed the charges when it could not locate witnesses.

Detective Hubbard testified that, during his January 1996 interview of Morgan, Morgan stated defendant came up pushing individuals and saying, "get out of my car." Morgan also stated

that, after defendant dropped the first gun, he lifted up his shirt and retrieved a second gun.  Additionally, Detective Hubbard testified several items recovered from the scene were sent to the crime lab for analysis and none of the items identified defendant.

Joseph Vigneri testified he was Morgan's attorney in the case where Morgan was charged in an alleged shooting incident.  Vigneri talked with Detective Hubbard and reached an agreement where Morgan would provide the police with a videotaped statement regarding defendant's involvement in the Bass Place incident and the State's Attorney's office would not object to Morgan being released on a recognizance bond.  Vigneri discussed the agreement with Morgan at the jail.  Vigneri also told Morgan that giving a truthful statement may help in the ultimate disposition of his case but Vigneri "couldn't be sure."

Jovawn Hendrix testified he is the brother of Leo and Donte and has the nickname "Spoony."  Jovawn did not know Renier or Morgan but did know Jesse Bates.  On the night in question, he was at Bass Place with Leo and Jarius Spence and was in and out of the club.  He admitted having one drink of hard liquor, which affected him a "little bit."  He along with Leo observed Donte and Renier "fighting some other guys from Springfield."  Leo separated Donte from the fight by grabbing him around his neck.  Renier then "spent" Leo around like he was going to hit him, and Jovawn jumped in the middle and pushed Renier.  Cory Vincent then jumped in the middle of them.  Renier inquired if Donte was okay,

and Donte explained Leo and Jovawn were his older brothers. Renier said, "he would ride out with Donte." Donte "rode out with him" when a fight took place earlier in the night at JB's.

Jovawn knew defendant through Leo and had seen him out other times in the past. He identified defendant in court. Jovawn first observed defendant come from outside the club four or five minutes after the fight. At that point, the misunderstanding between Leo and Renier and been resolved, and Renier was known to be a friend. Renier was standing at the car talking to somebody from Springfield in a Cadillac. Renier pointed up at Leo and Jovawn, and Leo told defendant about what had happened. Renier then started walking up toward them with his hand in his pocket and said to Leo, "What's up?" It looked like Renier had a gun and was going to shoot them. Jovawn saw defendant shoot a big, long revolver once and "got low" to avoid getting hit. He heard a "few" more shots. When asked if defendant acted in self-defense, Jovawn replied, "Most likely. Just nervous probably. Didn't know what was going on." Jovawn did not see defendant with a second gun. Jovawn testified he knew defendant by the nickname "Magic."

Jovawn did not give a statement to the police that night because he did not want to get involved. When he went to the police station two days after the event, he did not tell the police the same story as he told the jury. Jovawn denied telling the police he was inside Bass Place the entire night and was unaware of the shooting. Jovawn further stated that, if he told

the police that statement, it was because he did not want to get involved.

Jovawn had three felony convictions and a pending possession-of-a-controlled-substance charge. Jovawn had not received any promises regarding his pending charge in exchange for his testimony. However, he did give a prior statement to police regarding the Bass Place incident in exchange for the State not objecting to him receiving probation in an earlier case. Also, under that agreement, Jovawn's conviction and sentence for driving while license suspended were vacated.

Sergeant Shane Brandel testified he interviewed Jovawn on August 10, 2005, and Jovawn stated he stayed inside Bass Place the entire time and never went outside. Jovawn stated he was unaware of a shooting. Jovawn also stated he only saw Leo one time that night and never saw Donte. During the interview, Jovawn's demeanor was uncooperative.

Bates testified he was a Springfield resident. However, he grew up in Decatur and knew Donte and Leo. On the evening at issue, he went to Decatur with Renier, Morgan, Thomas, Latay Vincent, Cory Vincent, and Jacoby Carr. They took three cars, a Pontiac, a Cadillac with Lamborghini doors, and an Aurora with spinning rims. In Decatur, they drove around, went to JB's, drove around again, went to the Elk's, and then to Bass Place. Bates was sitting in one of the cars when he heard someone mention a fight. Bates got out of the car. He saw Leo grab Donte, and Renier hit Leo. Bates heard Donte say that Leo was

his brother.  After that, Bates saw someone come around a car.
The person said some cuss words and then shot Renier six or seven
times at "point[-]blank range."  Bates described the shooter as
light-skinned and chubby.  Bates acknowledged he had told the
police the shooter was around 5 feet 10 inches tall, weighed 200
to 220 pounds, and had a "very muscular build."

At the time of defendant's trial, Spence was in police
custody due to an arrest for a drug offense.  On the stand, he
denied giving Detective Scott Cline a recorded statement on
August 17, 2005.  He later admitted an officer had shown him
photographs and asked him to point out "Magic."  Spence stated he
told the officer he did not know a "Magic" and denied telling the
officer anything else.

Detective Cline testified he interviewed Spence on
August 17, 2005, and recorded the interview.  He described
Spence's demeanor during the interview as "reluctant."  During
the interview, Detective Cline showed Spence a photographic
lineup that included a photograph of defendant.  Spence did not
identify anyone in the lineup.  In Detective Cline's opinion, the
lineup photograph of defendant did not accurately depict defen-
dant as he was thinner in the photograph.  Detective Cline had
known defendant for 10 years, and defendant had gained "quite a
bit of weight" over the years.  Detective Cline guessed defendant
was 5 feet 10 or 11 inches and stated defendant's nicknames were
"Magic" and "Magic Folks."

The State played Detective Cline's interview of Spence.

Spence stated "Magic," Leo, and Donte were at Bass Place.  He did not see Spoony.  Spence had seen "Magic" a couple of times and described him as chubby, shorter than him (6 feet 1 inch), clean shaven, with a bob haircut.  A fight broke out near a car.  Magic was not involved in the fight.  Magic came up to the crowd and pulled up his shirt, displaying two guns in his waistband.  Shortly thereafter, Spence heard shots ringing out everywhere, including the parking lot.

Thomas testified Renier was following Donte around the parking lot.  Thomas took his eyes off Renier for a minute and then saw Leo choking Renier.  Thomas went over there and got Renier out of the "mix."  While Thomas was taking Renier back to the car, Thomas and Leo were having words, Donte was in the middle of Thomas and Leo, and Renier was apologizing for hitting Leo.  Thomas then apologized for Renier, but Leo "wasn't trying to hear that."  Thomas was trying to put Renier in the car, but Renier wanted to fight Leo because he had enough of Leo, who was not accepting his apologies.  Thomas heard gunshots and dropped to the ground.  Prior to the shots, Donte, Leo, and Renier were in his immediate area.  Leo was "steady walking toward us," and Donte was "steady holding back."  Those were the only people Thomas could remember in his eyesight.  Thomas heard 10 rapid-fire shots but did not see who was shooting.  Thomas testified Leo was 5 feet 10 inches with a thin build, dark skin, and gold teeth.  Thomas did not recall telling Detective Tim Carlton the man he described as Leo was the man who shot Renier.  Thomas

- 9 -

further stated it could have been Leo, but Thomas did not see the shooter as he was trying to put Renier in the car.

Detective Carlton testified he interviewed Thomas at the hospital after Renier had died. Thomas was "very somber" and difficult to interview because of "his state of mind." Thomas told Detective Carlton that, as he was escorting Renier to the vehicle, an individual pulled out a gun and just started shooting Renier at point-blank range. Thomas described the individual as 5 feet 10 inches, dark-skinned, very thin build, and gold teeth.

Roosevelt Bass testified his father owned Bass Place and he worked there. On August 8, 2005, he was standing in the doorway of Bass Place and saw the fighting and the sparks of the gun. He had seen defendant once or twice before that evening. Bass testified he could see the shooter well enough to know it was not defendant. Bass stated he did not know who the shooter was. Bass insisted he told the police after the incident that he could see who was shooting but did not know who it was.

Officer Nathan Binkley testified he was a Decatur police officer on August 8, 2005, and responded to the incident at Bass Place. In the course of his investigation, he interviewed Bass. Bass stated he was inside the building when he heard the gunshots and was unable to see who was shooting. Officer Binkley's interview with Bass was brief because Bass indicated he had not seen the crime.

Dr. Jessica Bowman, the forensic pathologist who performed Renier's autopsy, testified Renier had a total of 30

gunshot wounds, which included both entry and exit wounds. Renier's cause of death was a "gunshot wound to the chest with full thickness injury of the right cardiac atrium." That injury "would have killed him pretty quickly." Dr. Bowman also noted an abdominal gunshot wound "might have caused death" if the afore-mentioned wound had not been sustained. The two lethal wounds were caused by bullets that entered the front of the body. A third wound, which was above the fatal wound, penetrated internal organs, but "survival might have been possible" had the other two wounds not been sustained.

Detective Randall Chaney, a crime-scene technician with the Decatur police department, testified he observed three separate sets of shell casings at the scene. The first set was on Calhoun Street, just east of an entrance to Bass Place. Four 9-millimeter shell casings ran in a line near the west curb of Calhoun Street. Four other 9-millimeter casings were in a group farther north on Calhoun Street. Six other 9-millimeter casings appear to have been included in the first set. The second set was located near the intersection of Locust and Calhoun Streets, 200 feet north of the first set. It contained three .40-caliber shell casings. The third set was in the parking lot of Bass Place, slightly north and west of the first set. The third set contained three 9-millimeter shell casings, which contained special markings indicating it contained extra powder. Blood was also located on Calhoun Street near the club's east entrance. Three projectiles were found in the middle of Calhoun Street just

north of the blood.

Krail Lattig, a forensic scientist in the firearm and tool mark identification section of the Illinois State Police crime lab, testified (1) the 14 shell casings contained in the first set were fired from the same firearm, (2) the three .40-caliber shell casings contained in the second set were fired from the same gun, and (3) the three projectiles were all fired from the same weapon. Lattig did not specifically address whether the casings found in the third set were fired from the same gun. However, he opined a minimum of three guns and a maximum of four guns produced the firearms evidence recovered from Bass Place after the incident.

During deliberations, the jury sent a note, requesting the transcript of several witnesses' testimony and asking a question regarding guilt and reasonable doubt. The judge addressed the note, referring the jury to its recollection of the evidence and the jury instructions. The jury later returned a guilty verdict but answered the special interrogatory in the negative.

In October 2006, defendant filed a posttrial motion, asserting the State failed to prove defendant guilty beyond a reasonable doubt and noting the jury's guilty verdict was inconsistent with its answer to the special interrogatory. In November 2006, the trial court denied the motion and appointed defendant new counsel due to a conflict of interest. In July 2007, new counsel filed two more posttrial motions, which the trial

court denied.

At the August 2007 sentencing hearing, the trial court sentenced defendant to 50 years' imprisonment. Defendant filed a motion to reconsider and reduce his sentence, which the court denied on December 18, 2007.

On January 17, 2008, defendant filed a timely notice of appeal from his conviction and sentence in substantial compliance with Supreme Court Rule 606 (210 Ill. 2d R. 606). The only error in the notice of appeal was the statement that defendant's sentence was 50 months' probation. In April 2008, this court granted defendant leave to file a late notice of appeal pursuant to Rule 606(c) (210 Ill. 2d R. 606(c)) to fix the error.

## II. ANALYSIS

### A. Special Interrogatory

In this case, the trial court gave the following standard instruction for first degree murder:

"To sustain the charge of [f]irst [d]egree [m]urder, the State must prove the following propositions:

First Proposition: That the defendant performed the acts which caused the death of Tywon Renier.

Second Proposition: That when the defendant did so, he intended to kill or do great bodily harm to Tywon Renier;

or

- 13 -

he knew that his acts would cause death to Tywon Renier;

or

he knew that his acts created a strong possibility of death or great bodily harm to Tywon Renier.

If you find from your consideration of all of the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all of the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

See Illinois Pattern Jury Instructions, Criminal, No. 7.02 (4th ed. 2000) (hereinafter IPI Criminal 4th).

Moreover, at the request of the State, the trial court asked the jury the following special interrogatory:

"If you find the defendant guilty of [f]irst [d]egree [m]urder, your foreperson will preside during your deliberations on one additional question. In addition to the verdict forms, you will be provided two forms that are answers to the question: '[H]as the

State proven beyond a reasonable doubt that the defendant personally discharged a firearm that proximately caused death to Tywon Renier?'

Your agreement on an answer must be unanimous. Your answer must be in writing and signed by all of you including your foreperson."

The State had submitted the special interrogatory to obtain a sentence enhancement under section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2004), as amended by Pub. Act 94-165, §5, eff. July 11, 2005 (2005 Ill. Laws 1808, 1817)), in compliance with Apprendi v. New Jersey, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2362-63 (2000). During jury deliberations the jury asked the trial court the following question: "If we find defendent [sic] guilty but the [S]tate did not prove it beyond a reasonable doubt, what does that mean in layman's terms?" In response to the question, the court told the jury to review its instructions, and the jury later returned a guilty verdict and unanimously answered the special interrogatory in the negative.

Defendant contends the jury's negative answer to the special interrogatory was fatal to the guilty verdict. We disagree.

In People v. Jackson, 372 Ill. App. 3d 605, 609-12, 874

- 15 -

N.E.2d 123, 127-29 (2007), this court addressed special interrogatories in criminal cases. We explained no statutory authority exists for the use of special interrogatories in criminal cases. Jackson, 372 Ill. App. 3d at 610, 874 N.E.2d at 128. Even in civil cases where statutory authority does exist, courts must use special interrogatories with great care. Jackson, 372 Ill. App. 3d at 610, 874 N.E.2d at 128. For a special interrogatory to be in proper form in civil cases, the interrogatory must (1) relate to an ultimate issue of fact on which the parties' rights depend and (2) have a potential answer that would be inconsistent with a general verdict the jury might return. Jackson, 372 Ill. App. 3d at 611, 874 N.E.2d at 128. The civil statute provides that, "'[w]hen the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly.'" Jackson, 372 Ill. App. 3d at 611, 874 N.E.2d at 128, quoting 735 ILCS 5/2-1108 (West 2000). We noted the special interrogatory at issue in that case was improper under the civil rules because its answer could not control the general verdict. Jackson, 372 Ill. App. 3d at 611, 874 N.E.2d at 128.

After discussing the civil rules and the facts of the case at issue, we concluded that, absent a statute, the type of special interrogatories used in civil cases should not be used in criminal cases. Jackson, 372 Ill. App. 3d at 612, 874 N.E.2d at 129. We further noted no authority existed to ask a special interrogatory that would impinge upon a first-degree-murder

- 16 -

verdict. <u>Jackson</u>, 372 Ill. App. 3d at 612, 874 N.E.2d at 129. Thus, this court "refuse[d] to consider the answer to the 'special interrogatory' beyond the purpose for which it was asked--whether there could be a sentence enhancement." <u>Jackson</u>, 372 Ill. App. 3d at 612, 874 N.E.2d at 129.

Defendant contends this case is distinguishable from <u>Jackson</u> because the special interrogatory at issue in this case was proper under the civil rules and the jury's findings cannot be reconciled. However, in <u>Jackson</u>, we analyzed the special interrogatory under the civil rules to highlight the interrogatory's impropriety and why such rules were inapplicable in criminal cases. The crux of the <u>Jackson</u> decision is that, unlike civil cases, no statutory authority exists for special interrogatories that would impinge on a jury's verdict in criminal cases. See <u>Jackson</u>, 372 Ill. App. 3d at 612, 874 N.E.2d at 129. Thus, we found the proper way to address an unauthorized special interrogatory was to consider it only for its purpose of determining whether a sentence enhancement applied. See <u>Jackson</u>, 372 Ill. App. 3d at 612, 874 N.E.2d at 129.

We emphasize Illinois criminal law does not contain a provision analogous to section 2-1108 of the Code of Civil Procedure of 1963 (735 ILCS 5/2-1108 (West 2004)). Accordingly, by asking us to apply the civil statute to criminal cases, defendant is requesting us to judicially create a rule for criminal cases. We decline to undertake a role that belongs to the legislature. Thus, contrary to defendant's desires, no law

- 17 -

exists establishing an inconsistent answer to a special interrogatory trumps the verdict in criminal cases.

Case law addressing inconsistent guilty and acquittal verdicts supports our conclusion a guilty verdict cannot be challenged based on an answer to a special interrogatory. In People v. Jones, 207 Ill. 2d 122, 133-34, 797 N.E.2d 640, 647 (2003), our supreme court held defendants could "no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges." The Jones court found persuasive the statements the United States Supreme Court made in United States v. Powell, 469 U.S. 57, 83 L. Ed. 2d 461, 105 S. Ct. 471 (1984), as to why inconsistent verdicts in criminal cases should not be vacated. Jones, 207 Ill. 2d at 133, 797 N.E.2d at 647. The Powell Court articulated constitutional law does not require consistency in the verdicts and inconsistent verdicts can often be explained as a product of juror lenity. Jones, 207 Ill. 2d at 130, 797 N.E.2d at 645. The Court explained as follows:

> "'"'The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right

- 18 -

to exercise, but to which they were disposed through lenity.'"'" <u>Jones</u>, 207 Ill. 2d at 130, 797 N.E.2d at 645, quoting <u>Powell</u>, 469 U.S. at 63, 83 L. Ed. 2d at 467, 105 S. Ct. at 475, quoting <u>Dunn v. United States</u>, 284 U.S. 390, 393, 76 L. Ed. 356, 359, 52 S. Ct. 189, 190 (1932), quoting <u>Steckler v. United States</u>, 7 F.2d 59, 60 (2d Cir. 1925).

Moreover, the <u>Powell</u> Court set forth the following three additional reasons for refusing to allow defendants to challenge convictions on the basis of inconsistency.

"First, when a jury enters inconsistent verdicts, no one knows who the error benefits. Or, as the court put it, 'it is unclear whose ox has been gored.' <u>Powell</u>, 469 U.S. at 65, 83 L. Ed. 2d at 469, 105 S. Ct. at 477. All that a reviewing court knows is that either in the conviction or the acquittal the jury did not follow the instructions. Second, the court was concerned with fashioning a rule that would allow only the defendant to challenge an inconsistent verdict. Even though the inconsistency could harm either side, the government is precluded from challenging an acquittal on inconsistency grounds. <u>Powell</u>, 469 U.S. at 65, 83 L. Ed. 2d at 469, 105 S.

Ct. at 477. Finally, a defendant is still protected from jury irrationality because the defendant can always challenge his or her conviction on sufficiency of the evidence grounds. Powell, 469 U.S. at 67, 83 L. Ed. 2d at 470, 105 S. Ct. at 478." Jones, 207 Ill. 2d at 130-31, 797 N.E.2d at 645.

The situation at hand is very similar to the one in Powell, where the jury's conviction of the defendant on one count was inconsistent with its acquittal of him on another count because the jury found the same essential element both did and did not exist. Jones, 207 Ill. 2d at 135-36, 797 N.E.2d at 648. When a guilty verdict and a negative answer to a special interrogatory like the one at issue are irreconcilable, the jury has also found an essential element was proved beyond a reasonable doubt and not proved beyond a reasonable doubt. Moreover, the aforementioned reasoning set forth in Powell would also apply to inconsistencies between a verdict and a special interrogatory like the one at issue here.

Defendant contends this case is different because (1) the jury's question indicates the ox that has been gored and (2) the jury was not exercising lenity. See Powell, 469 U.S. at 65, 83 L. Ed. 2d at 468-69, 105 S. Ct. at 477. While the jury's question suggests the jury was thinking the State failed to prove defendant guilty beyond a reasonable doubt, the trial court instructed the jury to read and follow its instructions. The

- 20 -

jury instructions specifically stated the State had to prove beyond a reasonable doubt "defendant performed the acts which caused the death of Tywon Renier" to find defendant guilty of first degree murder. The jury later returned a guilty verdict and a negative answer to the special interrogatory. The jury could have just as easily changed its mind on the sufficiency of the evidence but answered in the negative to the special interrogatory, thinking it was benefitting defendant. We note the jury need not be familiar with criminal law to determine a negative answer to the interrogatory would favor defendant. Whatever the jury was thinking is still pure speculation on our part even with the jury's question. Thus, contrary to defendant's assertion, we do not know whom the error would benefit. Thus, we disagree with defendant the jury's question makes Powell's reasoning inapplicable to this case. Moreover, we note that, even with legally inconsistent findings, sufficiency-of-the-evidence review is a sufficient safeguard against jury irrationality. Jones, 207 Ill. 2d at 148-49, 797 N.E.2d at 655, citing Powell, 469 U.S. at 67, 83 L. Ed. 2d at 470, 105 S. Ct. at 478.

Accordingly, we continue to find a guilty verdict cannot be challenged based on an inconsistent answer to a special interrogatory absent a statute providing such. Since we have determined a defendant cannot challenge a conviction based on an inconsistent answer to a special interrogatory, we need not determine whether the guilty verdict and negative answer to the

special interrogatory are actually inconsistent because, even if they were, it would have no impact on the jury's guilty verdict. See People v. Pelt, 207 Ill. 2d 434, 440, 800 N.E.2d 1193, 1196 (2003).

### B. Sufficiency of the Evidence

Defendant also contends the State's evidence was insufficient to prove him guilty beyond a reasonable doubt of first degree murder.

In analyzing this issue, our function is not to retry the defendant. People v. Evans, 209 Ill. 2d 194, 209, 808 N.E.2d 939, 947 (2004). Rather, we review this issue under the well-established standard of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." People v. Carpenter, 228 Ill. 2d 250, 265, 888 N.E.2d 105, 114 (2008). This court "will not reverse a conviction unless the evidence is so unreasonable, improbable[,] or unsatisfactory that it raises a reasonable doubt of defendant's guilt." Evans, 209 Ill. 2d at 209, 808 N.E.2d at 947. Moreover, the United States Supreme Court has declared "[s]ufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt." (Emphasis added.) Powell, 469 U.S. at 67, 83 L. Ed. 2d at 470, 105 S. Ct. at 478; see also People v. Steidl, 142 Ill. 2d 204, 226, 568 N.E.2d 837, 845 (1991) (refusing to consider statements

- 22 -

that were never entered into evidence). Thus, we will not consider any evidence that was not presented at trial.

Additionally, we note the Powell Court indicated sufficiency-of-the-evidence review (1) is independent of a jury's determination the evidence on another count was insufficient and (2) "should not be confused with the problems caused by inconsistent verdicts." Powell, 469 U.S. at 67, 83 L. Ed. 2d at 470, 105 S. Ct. at 478. Thus, inconsistent verdicts are not part of the sufficiency-of-the-evidence analysis. See People v. Allen, 344 Ill. App. 3d 949, 958 n.2, 801 N.E.2d 1115, 1123 n.2 (2003). Likewise, we find the alleged inconsistent answer to the special interrogatory is not part of the sufficiency-of-the-evidence analysis.

In support of his argument, defendant notes no physical evidence links him to the crime scene, the two witnesses that named him as the shooter received benefits from the State, and the other witness gave descriptions that did not match defendant. The lack of physical evidence in a case does not raise a reasonable doubt where an eyewitness has positively identified the defendant as the perpetrator of the crime. See People v. Clarke, 391 Ill. App. 3d 596, 610, 915 N.E.2d 1, 13 (2009). In this case, both Morgan and Jovawn identified defendant as the person who shot Renier. Defendant contends no reasonable trier of fact would have believed Morgan and Jovawn because they did not identify defendant as the shooter until they received benefits from the State.

In support of his contention, defendant cites cases addressing accomplice and jailhouse-informant testimony. Such testimony has been identified as having inherent weaknesses. See People v. Penrod, 316 Ill. App. 3d 713, 720, 737 N.E.2d 341, 348 (2000) (accomplice testimony); People v. Saxon, 374 Ill. App. 3d 409, 423 n.4, 871 N.E.2d 244, 256 n.4 (2007) (McDade, J., dissenting) (noting the testimony of a jailhouse informant, especially when obtained in exchange for a deal, special treatment, or the dropping of charges has been identified as one of the principal factors leading to wrongful convictions). However, the record contains no evidence Jovawn and Morgan were defendant's accomplices in the shooting, and Jovawn and Morgan testified as eyewitnesses. Moreover, Morgan only testified defendant asked him to provide a statement he was not at Bass Place at the time of the shooting. Morgan did not testify defendant confessed to the crime while they were both in the Macon County jail.

We also point out Morgan's and Jovawn's deals with the State were regarding them providing a statement to the police. Jovawn and Morgan had both done that and had already received the benefits of their respective agreements. No evidence was presented the State had made any promises to them regarding their trial testimony. Additionally, Morgan's and Jovawn's failure to cooperate with the police until something was in it for them is consistent with Spence's actions. Spence was uncooperative on the stand and appeared reluctant on the videotape to give a statement to the police. Moreover, no evidence was presented

- 24 -

indicating Morgan and Jovawn conspired to name defendant as the shooter.

Contrary to defendant's argument, Morgan's testimony is similar to the testimony of other witnesses. Bass testified Morgan's distinctive Cadillac was present at Bass Place at the time of the shooting. Bates also testified Morgan was at Bass Place that night. Moreover, Bates, Thomas, and Morgan all testified a fight between Renier and Leo started after Leo had grabbed Donte. Morgan testified defendant came from around a van and started shooting. Similarly, Bates testified the shooter came between the cars and then started shooting. Morgan heard at least seven shots, and Bates heard six or seven. The fact the other witnesses did not describe Morgan as being in the fight is unimportant as all of the State's witnesses agreed the fight was between Leo and Renier after Leo had grabbed Donte. We note Bates also did not mention Thomas as being near Renier. More-over, Thomas testified that, after he saw Renier was shot, he yelled for help, and "a couple of people [he] was with came running from out of nowhere." That testimony suggests his friends were close to the action, and consistent with Morgan's testimony, he heard Thomas yell for help and then helped get the victim in the car.

Additionally, Bates's description of the shooter does not appear inconsistent with defendant's appearance set forth in the record. Bates testified the shooter was light-skinned and chubby. Shortly after the incident, Bates had told the police

the shooter was around 5 feet 10 inches tall, weighed 200 to 220 pounds, and had a "very muscular build."  When asked about the discrepancy between chubby and very muscular, Bates explained the shooter was big, bigger than him.  Detective Cline guessed defendant was 5 feet 10 or 11 inches and testified defendant was much heavier than he was several years ago.  We note it was the jury's function to evaluate any discrepancies in the witness's description of the offender and the defendant's appearance, and we will not overturn that determination "unless it is so contrary to the evidence as to be unjustified."  People v. Bayless, 99 Ill. App. 3d 532, 536, 425 N.E.2d 1192, 1194-95 (1981).  Additionally, contrary to defendant's assertion, Bates's description of the shooter is inconsistent with Leo's appearance; Thomas described Leo as 5 feet 10 inches, thin, and dark-skinned with gold teeth.

Spence did not see the shooter but did see "Magic" lift up his shirt and display two guns in the waistband of his pants before the shooting started.  Spence described "Magic" as chubby, shorter than him (6 feet 1 inch), clean shaven, with a bob haircut.  While Spence did not identify defendant as "Magic" in a photographic lineup, Detective Cline testified the photograph was old and defendant had put on a lot of weight.  Both Jovawn and Detective Cline testified "Magic" was a nickname of defendant's.  Moreover, Spence's description of Magic is also inconsistent with Thomas's description of Leo.

Thomas testified he did not see the shooter as he was

attempting to put Renier in the car. He explained the skinny, dark-skinned man with gold teeth was Leo, the man who he had witnessed fighting with Renier. While Detective Carlton testified Thomas told him the morning of the incident the shooter was the skinny male with gold teeth, Detective Carlton also stated Thomas was very difficult to interview as he had just learned of his brother's death.

Additionally, we note this case is distinguishable from People v. Smith, 185 Ill. 2d 532, 545, 708 N.E.2d 365, 371 (1999), where our supreme court concluded no reasonable trier of fact could have found the testimony of the only witness linking the defendant to the crime credible because the testimony had serious inconsistencies and was repeatedly impeached. Here, at least Morgan's testimony is relatively consistent with the testimony of the other witnesses who did not have a motive to lie. Moreover, at this point, Morgan had nothing to gain from his testimony against defendant.

The jury, as the trier of fact, possessed the responsibility to determine (1) the witnesses' credibility, (2) the weight to be given to their testimony, and (3) the reasonable inferences to be drawn from the evidence. People v. Jimerson, 127 Ill. 2d 12, 43, 535 N.E.2d 889, 903 (1989). The testimony of Morgan, Bates, Spence, and Detective Cline was sufficient for a jury to find defendant was the individual that shot Renier. Accordingly, we do not find the State's evidence was "so unreasonable, improbable[,] or unsatisfactory that it raises a reason-

able doubt of defendant's guilt."  <u>Evans</u>, 209 Ill. 2d at 209, 808 N.E.2d at 947.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.  As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

Affirmed.

MYERSCOUGH, P.J., and STEIGMANN, J., concur.