2022 IL App (1st) 191617-U

SECOND DIVISION
March 8, 2022

No. 1-19-1617

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16 CR 2064 |
| | ) | |
| JOSE JUAREZ, | ) | |
| | ) | Honorable Diane G. Cannon, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

ORDER

¶ 1    *Held*: The evidence admitted at trial was sufficient to sustain defendant's conviction for first-degree murder. The trial court did not abuse its discretion when it allowed the State to introduce evidence of defendant's gang membership as evidence of motive. Defendant is not entitled to relief under plain error review for alleged misstatements regarding the law of accountability. The trial court did not abuse its discretion by allowing certain text messages to be used to impeach defendant while he was being cross-examined. The trial court did not consider an improper factor during sentencing, and defendant failed to show that his sentence otherwise was the product of an abuse of discretion.

¶ 2    Following a jury trial, defendant Jose Juarez was found guilty of first-degree murder.

Defendant now appeals his first-degree murder conviction and his sentence of 45 years in prison.

Defendant argues on appeal that the evidence at trial was insufficient to sustain his conviction and that the trial court committed various evidentiary errors that denied him a fair trial. Defendant also argues that the trial court considered an improper factor when it sentenced him, and he urges us to vacate his sentence. We hold that the evidence was sufficient to sustain defendant's conviction, that none of the alleged evidentiary errors raised on appeal entitle him to relief, and that the trial court did not abuse its discretion in fashioning his sentence. Accordingly, we affirm.

¶ 3                                    BACKGROUND

¶ 4       On January 7, 2016, 17-year-old David Gonzalez was shot multiple times on the west side of Chicago. He died before reaching the hospital. An autopsy revealed that Gonzalez had been shot eight times from behind, and one of the bullets entered his back and penetrated his heart, lungs, and aorta before exiting his body through his chest.

¶ 5       Chicago police officers Javier Alvarez and Gerardo Calderon were on patrol in the area of the shooting when they believed they heard gunshots. Shortly thereafter, they observed a white SUV fail to stop at a stop sign. They began to follow the SUV which continued at a high rate of speed and committed additional traffic violations, including failing to stop at additional stop signs. The officers attempted to pull over the vehicle, but the vehicle failed to stop and instead proceeded the wrong way down a one-way street. The suspicious vehicle eventually crashed into a stop sign and a fence, and three male Hispanics, including defendant, exited the vehicle and fled on foot.

¶ 6       Officer Calderon chased defendant while Officer Alvarez chased Sergio Gonzalez. Officer Calderon observed that defendant was in possession of a firearm with a large extended magazine as he fled. There was conflicting evidence about whether defendant pointed the firearm

at the pursuing officer, but Officer Calderon fired two shots at defendant. Defendant stopped fleeing and dropped to the ground, and Officer Calderon approached defendant, secured a .40-caliber semi-automatic pistol, and placed defendant under arrest.

¶ 7     Other responding officers found Sergio Gonzalez hiding underneath a porch. Gonzalez was missing a shoe, which the officers found in a nearby intersection. When the officers retraced the path of Gonzalez's flight and searched that area, they found a 9-millimeter pistol in an alley. A search of the abandoned SUV revealed five 9-millimeter cartridges and four .40-caliber cartridges. Additional cartridges were found in the street at the scene of the shooting. All of the bullet casings recovered from the vehicle and the crime scene matched either the 9-millimeter gun found in the alley or the .40-caliber gun carried by defendant. A gunshot residue test was administered on defendant and the test was positive for gunshot residue.

¶ 8     During a search of defendant's cellphone, officers found that defendant had downloaded a police scanner app on his phone. A specialist in digital forensics, Steven Strahm, observed that defendant had accessed the scanner channel for the local police division at sometime between 8:00 pm and 10:30 pm on the night of the shooting. The shooting occurred around 10:30 pm. Officers also found evidence of defendant's involvement in a gang on his phone. Defendant had images on his phone of himself and others displaying gang signs as well as text messages suggesting he was a member of the Latin Kings. An expert on street gangs testified that the Latin Kings and Two-Six were engaged in hostilities at the time of the murder. The day before the shooting, defendant downloaded an image that said "gang killa" with the symbol for Two-Six upside down in a sign of disrespect. David Gonzalez was reportedly a member of the Two-Six.

¶ 9     Officers also uncovered text messages on defendant's phone to a contact named "babymama" who was later identified to be Fabiola Cervantes with whom defendant had a child.

The text message evidence revealed that defendant texted Cervantes after he was arrested and told her to "get a lawyer and go get money." Cervantes responded "WTF you do?" and defendant replied "love you." Cervantes also asked defendant the whereabouts of "Mafia," Sergio Gonzalez, who was arrested along with defendant.

¶ 10 At one point during trial, after evidence of defendant's gang membership was introduced, a member of the jury sent a note to the court. The juror wrote that "it appears that the Defendant might be in a gang and [gang] members might be in court." The juror asked "What protection is there for members of the jury?" The court came to realize that two observers in the gallery had been individuals that were present in the photograph from defendant's phone where the photographed men were displaying gang signs. The court sent a note to the jury that stated "Please continue with your attention to the trial. There's no need to be concerned, it's a public courtroom and many people come in and out."

¶ 11 Defendant testified in his own defense. He conceded that he was a member of the Latin Kings. He testified that he was present in the SUV at issue because an acquaintance, called Grizzly, agreed to give him a ride home. Grizzly was driving, defendant was in the front passenger seat, and "Mafia" was in the backseat. Defendant testified that Grizzly parked the SUV near an alley on 41st Street when an unfamiliar man approached the vehicle, shouted "Two-Six," and began shooting at them. Defendant ducked down and he heard gunshots coming from outside the car and then from inside the car. Defendant could not see who was shooting because he was ducking down in the vehicle.

¶ 12 Defendant testified that, after the shots were fired, the car started moving. Grizzly, the driver, handed defendant a gun which defendant was supposed to throw out the window. However, the police were behind them and defendant did not want the police to see him be the

one to throw the gun out the window. Defendant testified that he and the other two men fled the vehicle and he brought the gun with him because it would have his fingerprints on it.

¶ 13    Defendant admitted that he told the officer who was about to conduct the gunshot residue test that he was left-handed, in an apparent attempt to mislead the officer and cause him to examine the wrong hand. Defendant also admitted that he told the officers that he was on foot at the time of the shooting and not in the vehicle. Defendant testified that "Mafia" is a person that he sometimes sees around the way but not someone he hangs out with, and defendant testified he had not seen Mafia in a long time before the day of the shooting.

¶ 14    The State urged the jury to find defendant guilty of first-degree murder for shooting and killing David Gonzalez. Along with determining whether defendant was guilty of first-degree murder, the jury was also charged with determining whether the State proved that defendant personally discharged a firearm. The State alternatively urged the jury to find defendant guilty of murder on a theory of accountability. Jury instructions on accountability were tendered.

¶ 15    During deliberations, the jury sent a note to the court asking for further guidance on the definition of accountability. The defense and the State agreed that the court should instruct the jury to follow the law as it was given to them and that there were no further instructions. The jury found defendant guilty of first-degree murder beyond a reasonable doubt. The jury, however, found that the State did not prove beyond a reasonable doubt that defendant personally discharged a firearm. Defendant filed a posttrial motion which was denied. After a sentencing hearing, the trial court sentenced defendant to 45 years in prison.

¶ 16    Defendant filed this appeal, and he raises five issues that he claims entitle him to relief on appeal. First, defendant argues that he was not proved guilty of first-degree murder beyond a reasonable doubt. Defendant contends that there was insufficient evidence to prove him guilty on

an accountability theory and, because the jury found that he did not personally discharge a firearm, he was not proved guilty of first-degree murder. Second, defendant argues that he was denied a fair trial because the trial court admitted into evidence an excessive amount of evidence pertaining to his membership in a gang. Third, defendant argues that the court and the prosecution misstated the law of accountability during *voir dire* and that the prosecution misstated the law in its closing argument. Fourth, defendant argues that he was denied a fair trial when the State asked defendant about the text message in which he instructed his girlfriend to contact a lawyer. And fifth, defendant argues that he is entitled to resentencing because the trial court sentenced him under a belief that he personally shot at the victim despite the jury not making such a finding. The State filed a response brief, countering the arguments defendant makes on appeal. Defendant did not file a reply brief.

¶ 17                                ANALYSIS

¶ 18                        A. Sufficiency of the Evidence

¶ 19     Defendant argues that he was not proved guilty of first-degree murder beyond a reasonable doubt. Defendant posits that, because the jury found that he did not personally discharge a firearm and because there were insufficient facts from which the jury could have found him guilty on an accountability theory, his conviction for first-degree murder cannot stand.

¶ 20     In assessing whether the evidence against a defendant is sufficient to prove guilt beyond a reasonable doubt, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Taylor*, 186 Ill. 2d 439, 445 (1999). A defendant's conviction should not be set aside on grounds of insufficient evidence unless the

proof is so improbable or unsatisfactory that a reasonable doubt exists about the defendant's guilt. *Id.*

¶ 21    Defendant's argument concerning the sufficiency of the evidence begins from the flawed premise that because the jury returned a negative finding on the firearm enhancement, his conviction can only stand if he was proved guilty as a non-shooter under an accountability theory. However, the jury's finding that defendant did not personally discharge a firearm for purposes of the firearm enhancement is not equivalent to a finding that there was a lack of sufficient evidence that defendant fired a weapon for purposes of a murder charge. Illinois courts have rejected the claim defendant makes here:  "defendants in Illinois can no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges." *People v. Jones*, 207 Ill. 2d 122, 133-34 (2003); see also *People v. Reed*, 396 Ill. App. 3d 636, 648 (2009) (defendant cannot challenge a conviction based on an inconsistent answer to a special interrogatory); *People v. Jackson*, 372 Ill. App. 3d 605, 612 (2007) (courts will not use a jury's response to a sentence enhancement inquiry for any purpose other than sentence enhancement). "[E]ven with legally inconsistent findings, sufficiency-of-the-evidence review is a sufficient safeguard against jury irrationality." *Reed*, 396 Ill. App. 3d at 648; *People v. Ealy*, 2019 IL App (1st) 161575, ¶¶ 25-26 (rejecting the same argument defendant raises here); see also *People v. Ware*, 2019 IL App (1st) 160989, ¶¶ 53-56; *People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 171. The firearm enhancement is not tantamount to a special interrogatory in a civil case that controls over the general verdict. Instead, regardless of the jury's finding on the firearm enhancement, our role sitting in review is to determine whether there was sufficient evidence for a reasonable jury to find defendant guilty of first-degree murder. In this case, we are charged with determining whether there was sufficient evidence to support defendant's conviction as

either someone who fired a weapon in the shooting or as a participant for aiding his codefendants under an accountability framework.

¶ 22    Viewing the evidence in the light most favorable to the State, the evidence was sufficient for a rational trier of fact to have found the essential elements of first-degree murder beyond a reasonable doubt. Along with the physical and forensic evidence, the gang motive, defendant's flight, his possession of the weapon used in the shooting, his inconsistent statements, and the lies he now admits that he told to investigators, we conclude the evidence to convict defendant for first-degree murder was overwhelming. In the initial investigation, defendant made false exculpatory statements to police. Defendant told investigators that he was walking when the shooting occurred before later admitting he was present in the vehicle. Defendant lied when he told investigators that he is left-handed in an apparent attempt to foil the gunshot residue test. Defendant was traveling with "Mafia," who defendant claimed he did not know very well and had not seen or spoken to for months before the shooting. However, when defendant texted his girlfriend from the back of the police car after the shooting, the girlfriend asked defendant where Mafia was at, without being prompted, suggesting defendant was being untruthful about his relationship with Sergio Gonzalez. The false statements defendant made to police, his flight from the scene in a car after the shooting with his codefendants, and his flight from police to evade arrest after the car crashed constitutes evidence of his consciousness of guilt. "A false exculpatory statement is 'probative of a defendant's consciousness of guilt.' " *People v. Shaw,* 278 Ill. App. 3d 939, 951 (1996); see also *People v. Muhammad,* 257 Ill. App. 3d 359, 368 (1993); *People v. Seawright,* 228 Ill. App. 3d 939, 969 (1992); *People v. Milka*, 211 Ill. 2d 150, 181 (2004). "It is well established that the State may prove that a defendant resisted arrest or fled

from arrest, since evidence of flight is competent as tending to show guilt of the crime charged in the indictment." *People v Wright,* 30 Ill. 2d 519, 523 (1972).

¶ 23    While defendant's challenge to the sufficiency of the evidence focuses only on the State's proof under a straight accountability theory without being a shooter, a rational jury could have concluded that defendant was guilty of first-degree murder as a shooter. This alone is sufficient to affirm defendant's conviction for first-degree murder. *Ealy*, 2019 IL App (1st) 161575, ¶¶ 25-26. There was physical and forensic evidence that demonstrated that there was one driver and two shooters who engaged in a drive-by shooting that killed David Gonzalez. The evidence admitted at trial suggested that the vehicle was moving when the shots were fired and that there were two shooters firing at the victim from the passenger side of the vehicle while the third person was driving. Defendant admitted he was not the driver of the car. Defendant was seen by Chicago police officers fleeing the scene and carrying one of the weapons used in the shooting. A gunshot residue test was administered on defendant and the test was returned positive for gunshot residue. The victim and defendant were members of rival gangs that were engaged in active hostilities and defendant had images on his phone showing disrespect to the victim's gang, some of which were saved to defendant's phone in the days leading up to the shooting.

¶ 24    Defendant advanced a version of self-defense, claiming that David Gonzalez fired at the SUV and that Grizzly and Mafia started returning fire. But no gun was found on or near Gonzalez's body and all of the bullet casings recovered from the scene were from the guns recovered from defendant and his codefendants. Additionally, Gonzalez was shot eight times from behind, so the claim that Gonzalez was facing and firing at the SUV and was shot by return fire was not supported by the evidence. The evidence also showed that Gonzalez was struck in the back by shots fired from a moving vehicle, contrary to defendant's claim that the event

happened while the vehicle was stationary after Grizzly had parked the vehicle and Gonzalez started shooting at them.

¶ 25    Defendant also had a police scanner app on his phone that was active around the time of the shooting and was accessing the police communications from the area in which the shooting occurred. When the evidence is viewed in a light most favorable to the State, we conclude there was sufficient evidence introduced at trial upon which a rational trier of fact could find defendant guilty of first-degree murder beyond a reasonable doubt.

¶ 26                    B. Admission of Gang Evidence

¶ 27    Defendant argues that he was denied a fair trial because the court admitted an excessive amount of gang evidence. Defendant maintains that the evidence was more prejudicial than it was probative. Defendant points out that the trial court initially denied the State's motion *in limine* to admit gang evidence. Defendant contends that the juror's note expressing fear about defendant's gang membership and the presence of gang members in the trial gallery demonstrated the prejudicial effect of the court's admission of gang evidence.

¶ 28    A trial court's evidentiary rulings with respect to gang-related evidence are reviewed for an abuse of discretion. *People v. Villarreal*, 198 Ill. 2d 209, 232 (2001). Such evidence may be admitted so long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. *People v. Johnson*, 159 Ill. 2d 97, 118 (1994). However, evidence of gang membership is admissible only when there is sufficient proof that gang membership is related to the crime charged. *People v. Smith*, 141 Ill. 2d 40, 58 (1990).

¶ 29    In balancing the probative and prejudicial values of admitting gang evidence, the evidence is subject to exclusion only if its probative value is substantially outweighed by its prejudicial impact. *People v. Morales*, 2012 IL App (1st) 101911, ¶ 45. Evidence of gang

affiliation is relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *People v. Johnson*, 208 Ill. 2d 53, 102 (2003). One of the purposes for which gang evidence is admissible is to provide a motive for an otherwise inexplicable act. *Villarreal*, 198 Ill. 2d at 233; see also *People v. Furdge*, 332 Ill. App. 3d 1019, 1023–24 (2002) (gang evidence admissible to show motive when defendant and victim belong to rival gangs engaged in active hostilities). While it is well established that gangs are regarded with considerable disfavor, gang-related evidence will not necessarily be excluded if it is otherwise relevant and admissible. *People v. Kirkman*, 241 Ill. App. 3d 959, 964 (1993).

¶ 30    In this case, the trial court initially allowed the State to introduce evidence of defendant's gang affiliation after the defense insinuated on cross-examination that the only relevant information found on defendant's cell phone was the police scanner app. The trial court ruled before trial on motions *in limine* that it would allow the introduction of gang evidence if defendant raised a claim of self-defense. During its opening statement, the defense raised defendant's claim of self-defense. Later, defendant testified that David Gonzalez began shooting at the SUV he was in, that Gonzalez shouted the name of his gang before shooting, and that the other passengers returned fire.

¶ 31    The trial court did not abuse its discretion admitting the gang evidence that was admitted in this case. The evidence of defendant being in a rival gang to the victim was information that was helpful to understand how and why this crime might have been committed. Defendant had no connection to the victim other than their gang rivalry. The State's narrative of the case, which was supported by evidence, was that defendant and the victim's rival gang affiliation was the only fact that would explain why defendant would kill David Gonzalez. The veracity of the

11

evidence of defendant's gang membership was not in question. Some of the gang evidence retrieved from defendant's phone was downloaded in the days before the shooting and the State introduced that evidence to show defendant's ongoing engagement in gang-related activity and his awareness of the hostilities between his gang and the Two-Six. The narrative of the case, including questions raised by defendant's own testimony, called for the admission of gang evidence to help the jury understand the totality of the circumstances of the crime. The evidence of defendant's gang membership was highly probative in this case and the prejudicial effect did not substantially outweigh its probative value.

¶ 32    Defendant contends that the amount of gang evidence was overwhelming and that it cumulatively had too great of a prejudicial effect. Defendant points to the juror's note expressing fear about defendant's gang membership and the presence of gang members in the gallery viewing the trial as an indication that defendant was overly prejudiced in the eyes of the jury. A review of the gang evidence that was offered, however, demonstrates that there was an evidentiary justification for each piece of gang evidence that was admitted. Because gang hostility and gang affiliation were the sole source of motive in the case, it is understandable that the prosecution would need to offer a fair amount of gang evidence to help a factfinder understand how this crime could occur. Defendant does not point to any gang evidence that was admitted that was particularly gratuitous or used for the sole purpose of portraying defendant in a negative light in the eyes of the jury.

¶ 33    As defendant points out, after evidence of his gang membership was introduced, a member of the jury sent a note to the court. The juror wrote that "it appears that the Defendant might be in a gang and [gang] members might be in court." The juror asked "What protection is there for members of the jury?" Defendant argues that this expression by the juror demonstrates

how the gang evidence prejudiced him in the eyes of the jury. However, the juror stated that it *appeared* that defendant *might be* in a gang. Moreover, the court sent a note back to the juror that stated, "Please continue with your attention to the trial. There's no need to be concerned, it's a public courtroom and many people come in and out." There is no indication that there was any further apprehension from the jury surrounding the gang issue. Defendant points to nothing that suggests the jury could not abide by its oath to judge him solely on the evidence. The trial court did not abuse its discretion in allowing gang evidence on an individual or cumulative basis and the record does not show that the admission of gang evidence prohibited defendant from receiving a fair trial.

¶ 34        C. The Prosecution and the Court's Statements on the Law of Accountability

¶ 35        Defendant argues that the State and the trial court made erroneous and confusing comments about the law of accountability during *voir dire* and closing argument. Defendant acknowledges that he did not properly preserve these issues for review because he did not object at the time of the alleged errors nor did he raise the issues in a posttrial motion. Defendant urges us to find that the alleged errors constitute plain error or, alternatively, that his counsel was ineffective for failing to raise the issues.

¶ 36    To preserve an issue for review on appeal, a defendant must object to claimed errors at trial and raise them in his posttrial motion; otherwise, they are procedurally defaulted or forfeited. *People v. Perry*, 2011 IL App (1st) 081228, ¶ 68. The plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error under one of the two prongs of the plain error rule: (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186–87 (2005). "In the first instance, the defendant must prove

'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Id*. Defendant argues that, in this case, "both prongs are satisfied." However, we have already concluded that the evidence of defendant's guilt is overwhelming, contrary to defendant's claim. Therefore, we will proceed to examine his claim under the second prong of plain error. The first step in plain error analysis is to determine whether there was an error.

¶ 37    During *voir dire*, the State attempted to explain the law of accountability to the prospective jurors. The State explained that if three people decided to rob a bank and one of them was just the getaway driver, all three could be guilty of robbery. Defendant contends that the trial court erroneously told the prospective jurors that the court believed the legal instruction for accountability stated that the person aids or assists "before, during or after the commission of an offense." Defendant argues that the State subsequently reminded potential jurors about the judge's erroneous instruction and that the court never corrected its mistake.

¶ 38    During closing argument, the prosecutor gave an example of accountability by describing a situation where he was lifting a board and his co-counsel offered to help by picking up the other side of the board. The prosecutor analogized that situation to this case wherein Sergio Gonzalez began shooting at David Gonzalez and defendant offered to help by shooting his weapon. The prosecutor stated that the driver then offered to help by driving them, and that all three participants were equally responsible because they worked as a team. Defendant argues that

the State confused and misled the jury because it led the jury to believe that innocent intent and innocent conduct could be the basis for a conviction under a theory of accountability.

¶ 39    The State began its discussion of accountability in its closing argument by correctly quoting the accountability jury instruction. While the analogy about lifting the board in the State's closing argument was not the most artful expression of the law of accountability, the prosecutor did not misstate the law. The State never conveyed to the jury that defendant could be found guilty for engaging in innocent conduct. The prosecutor did not lead the jury to believe that defendant could be found guilty simply for being present in the vehicle as defendant suggests. Instead, the State insisted that defendant could be found guilty for assisting in the commission of the murder by firing a gun at the victim—committing a criminal act with criminal intent. We conclude there was no error.

¶ 40    However, even if we assume the argument was error, the error was cured because, as defendant concedes, the trial court properly instructed the jury on the law of accountability before its deliberations and tendered the correct jury instruction to the jury. *People v. Moreno*, 238 Ill. App. 3d 626, 636 (1992) (correct jury instruction on accountability cured prejudice from prosecutor's misleading hypothetical during closing arguments); *People v. Christiansen*, 142 Ill. App. 3d 1050, 1058 (1986) ("Improper closing arguments which misstate the law of accountability may be cured by giving a proper jury instruction on the law of accountability."); *People v. Allen*, 272 Ill. App. 3d 394, 404 (1995). Defendant has failed to show that any misstatement of the law during closing argument denied him the right to a fair trial or entitles him to relief under plain error review and we further find any alleged error was cured by the court when it gave an accurate instruction to the jury.

¶ 41    Defendant includes a one-paragraph contention that his counsel was constitutionally ineffective for failing to object to the prosecution and the court's misstatements on the law of accountability. The United States Constitution guarantees criminal defendants the right to effective assistance of counsel. U.S. Const. Amend. VI (West 2016). Thus, where a criminal defendant is convicted of an offense but did not receive constitutionally adequate representation, he can seek relief to vindicate his constitutional right to counsel. *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 9. To be entitled to relief on a claim of ineffective assistance of counsel, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *People v. Scott*, 2015 IL App (1st) 131503, ¶ 27. We analyze claims of ineffective assistance of counsel by considering the entire record. *People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010).

¶ 42    Defendant argues that there was no reasonable strategic decision for counsel to fail to object to the alleged misstatements of law and that defense counsel's failure to object undermined confidence in the outcome of the proceedings. However even if we assume trial counsel's performance was deficient, defendant was not prejudiced because the trial court accurately instructed the jury on the law of accountability. Because the jury was properly instructed on the law of accountability, defendant has not demonstrated that his counsel's failure to object to an alleged errant statement about accountability prejudiced him, tipped the scales against him, or constituted a material factor in his conviction.

¶ 43        D. Text Message Evidence in which Defendant Mentioned Needing a Lawyer

¶ 44    Defendant argues that he was denied a fair trial when the State introduced text message evidence in which defendant told his girlfriend to "call my lawyer." Defendant argues that the

text message requesting that his girlfriend contact a lawyer was irrelevant and not admissible. Defendant also argues that the message about the lawyer was "protected" and that it was highly prejudicial, with its only purpose being "to paint defendant with a guilty mind." Defendant points out that the court ruled on a motion *in limine* that the text message about calling a lawyer would not be admitted at trial, but that the State "purposefully violated the court order bringing this irrelevant and prejudicial statement before the jury."

¶ 45    "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ill. R. Evid. 401 (West 2020). When evidence is relevant, it is generally admissible, but the trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, among other reasons. Ill. R. Evid. 403 (West 2020). Whether to admit a particular piece of evidence during a trial is within the sound discretion of the trial court, and we will not reverse such a ruling absent an abuse of discretion. *People v. Tenney*, 205 Ill. 2d 411, 436 (2002). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 46    The text message evidence at issue was introduced for purposes of impeachment during cross-examination of defendant. When a defendant takes the stand in his own defense, he becomes subject to impeachment by cross-examination, as does any other witness. *People v. Leggans*, 253 Ill. App. 3d 724, 729 (1993). Wide latitude in impeachment of witnesses is permissible where the credibility of the witness is crucial. *Id.* The purpose of impeachment evidence is to cast light on the credibility of the witness, not to show the truth of the

17

impeachment evidence itself. *Id.*; see *People v. Taylor*, 345 Ill. App. 3d 1064, 1079 (2004) (holding that the State was permitted to introduce the fact that defendant invoked his right to remain silent when defendant was attempting to cast his police interview in a false light). "An abuse of discretion occurs when no reasonable person would take the view adopted by the court." *In re Dionte J.*, 2013 IL App (1st) 110700, ¶ 64. Moreover, the trial court's ruling will not be overturned unless the abuse of that discretion led to manifest prejudice against defendant. *People v. Hudson*, 157 Ill. 2d 401, 435 (1993); *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133.

¶ 47    Defendant testified he was not close to Sergio Gonzalez, who is called "Mafia." The text message evidence about defendant requesting that his girlfriend contact a lawyer was introduced as impeachment when defendant testified that he barely knew "Mafia," Sergio Gonzalez. The text messages between defendant and his girlfriend shed light on the veracity of defendant's testimony because, after defendant informed his girlfriend to go get money and call his lawyer, his girlfriend responded, "Where is Mafia?" The chain of text messages was presented as impeachment and was likely necessary to give the jury the full context of the conversation. While it was undoubtedly harmful to defendant's credibility and to his defense, we cannot say that allowing the question was beyond the bounds of permissible impeachment such that it amounted to an abuse of discretion. The evidence was not offered in the State's case-in-chief or relied upon by the State in its opening statement or closing argument. And even though the trial court originally ruled that it would not allow the evidence to be admitted, it overruled defendant's objection based on the particular circumstances that unfolded at trial. The text message evidence about contacting a lawyer was not a significant part of the trial when the totality of the record is considered, and we find no abuse of discretion and defendant has failed to show that the admission of the evidence led to manifest prejudice against him.

¶ 48    E. Trial Court's Expression During Sentencing that Defendant was One of the Shooters

¶ 49    Following the jury's verdict, the trial court entered judgment on the conviction and a sentencing hearing was held. During the sentencing hearing, the trial court expressed its belief that defendant was one of the two shooters in the murder. The trial court based its conclusion on the physical and forensic evidence. Defendant claims that the trial court's belief that he was one of the shooters played a large role in the trial court handing down a 45-year sentence where the applicable sentencing range was 20-60 years. Defendant argues that the trial court's emphasis on this fact during sentencing constituted an abuse of discretion because the jury explicitly rejected defendant being a shooter when it issued its verdict.

¶ 50    As explained above (see *supra* Section A) the jury's finding with regard to the firearm enhancement is not controlling for purposes of the murder charge. See *Ealy*, 2019 IL App (1st) 161575, ¶¶ 25-26. The trial judge was not constrained at sentencing to base defendant's sentence on the jury's negative finding with regard to the firearm enhancement. Instead, the trial court properly considered the totality of relevant, admissible evidence and fashioned a sentence within the applicable sentencing range.

¶ 51    A reviewing court may not alter a defendant's sentence absent an abuse of discretion by the trial court. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A sentence will be deemed an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id*. A sentence imposed within the statutory range is presumed to be proper. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. The circuit court has broad discretionary powers in imposing a sentence, and its sentencing decision is entitled to "great deference." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Here, the

trial court was not prohibited from considering the physical evidence that supported a finding that defendant was one of the shooters in this case, and defendant has failed to demonstrate that the trial court otherwise abused its discretion in fashioning his sentence.

¶ 52                                   CONCLUSION

¶ 53    Accordingly, we affirm.

¶ 54    Affirmed.