2021 IL App (2d) 190514-U
No. 2-19-0514
Order filed August 12, 2021

**NOTICE**: This order was filed under Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CF-611 |
| | ) | |
| ADAM C. MORRIS, | ) | Honorable |
| | ) | Sharon L. Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Justices Birkett and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court did not abuse its discretion in refusing to admit hearsay statement made by co-offender to an inmate in the county jail, and alleged inconsistency between jury's verdict convicting defendant of first-degree murder and its failure to find that defendant discharged a firearm for purpose of sentencing enhancement did not afford basis to grant relief to defendant.

¶ 2                                  I. INTRODUCTION

¶ 3    Following a jury trial in the circuit court of McHenry County, defendant, Adam C. Morris, was convicted of first-degree murder (knowing), a second count of first-degree murder (felony murder), armed robbery, burglary, and unlawful possession of a weapon by a felon. He was sentenced to consecutive prison terms of 38 years (knowing murder), 26 years (armed robbery),

and 7 years (burglary). The trial court declined to impose a sentence for the felony-murder conviction on one-act, one-crime principles. See *People v. Artis*, 232 Ill. 2d 156, 161 (2009). He was also sentenced to a concurrent 4-year term of imprisonment for unlawful possession of a weapon by a felon. He now appeals.

¶ 4     On appeal, defendant raises two main issues. First, he contends that the trial court erred in excluding as hearsay testimony that would have supported his claim that he did not participate in the crime. Second, he asserts that the jury's finding of guilt regarding first-degree murder is inconsistent with its failure to find that he personally discharged a firearm during the offense. For the reasons that follow, we affirm.

¶ 5                                    II. BACKGROUND

¶ 6     Defendant's convictions arise from an incident occurring on May 27, 2017. Defendant, along with others, was alleged to have gone to the house of his employer with the intent to commit a theft. He entered that residence, the State alleged, and while there personally discharged a firearm which resulted in the shooting death of Donald Jouravleff. The State further alleged that he also took U.S. currency by use of force from Donna Mills.

¶ 7     At trial, the following evidence was adduced (witnesses whose testimony is solely foundational regarding various exhibits is omitted). Grant Havens first testified that he was a 911 operator. He received a call from a woman at approximately 1 a.m. on May 27, 2017. The woman stated that there was a home invasion and her husband had been shot.

¶ 8     Officer Timothy Bengston of the McHenry County Sheriff's Department testified that he was working with Deputy Kuczek, a recruit, on May 27, 2017. They responded to the crime scene, parking half a block away. They approached the house. Bengston could hear a female calling for help. They entered and observed Mills applying pressure to Jouravleff's neck. Jouravleff was

bleeding. Bengston observed a shell casing on the floor. Deputy Kuczek testified consistently with Bengston.

¶ 9     Officer Kevin Byrnes, also of the McHenry County Sheriff's Department, testified that he responded to the crime scene on the night of the incident. While enroute, he observed a white male walking in the area. He detained the individual and identified him as Timothy Reiter. He released Reiter. Byrnes continued to the crime scene. Subsequently, Byrnes drove Mills to the hospital.

¶ 10     Timothy Reiter then testified that around 11:30 p.m. on May 26, 2017, or perhaps later, he left his home to go to a local tavern. He walked and was alone. On his way there, he passed three individuals, who were also walking. He did not know them, and they exchanged a brief greeting. The bar was closed. Reiter decided to walk to another tavern. He was passed by an older, dark-colored SUV; Reiter assumed it was operated by the three individuals he had passed on the street. The vehicle had a loud muffler. While walking to the second tavern, a police officer detained and searched him. On cross-examination, Reiter stated that he could not see inside the SUV that passed him. He participated in photographic lineups, but was unable to identify anyone. On redirect-examination, he stated that the three individuals he passed on the street were all white.

¶ 11     William Lynch, who resided in the neighborhood of the crime scene, testified that he "heard a pop, pop" between 12:30 a.m. and 1 a.m. on May 27, 2017. He looked out the window. He heard what sounded like a man and woman arguing. Subsequently, a truck "sped by." It was a dark-colored vehicle with a loud exhaust. The headlights were off, though the driver was using the turn indicator. On cross-examination, Lynch stated that he could not see inside the truck.

¶ 12     Travis Wolthausen testified that he was a paramedic with the Nunda Rural Fire Protection District on May 27, 2017. He responded to the crime scene along with two other paramedics. They went inside and observed the victim. He was conscious but unresponsive. Wolthausen observed

that Jouravleff had suffered four gunshot wounds. He was not sure whether they were entrance or exit wounds. They transported Jouravleff to the hospital, arriving at 1:33 a.m. On cross-examination, Wolthausen testified that he did not know who shot Jouravleff.

¶ 13    Donna Mills also testified for the State. Mills stated that she was the president of A Best Movers. The company's office was in the basement of her home, which is located in McHenry. In May 2017, she had two primary drivers, Roy Daniels and Joe Ronzio. Jobs were assigned to the drivers, and it was left up to them how to complete their work. Sometimes, the drivers would hire their own subcontractors. Typically, the drivers would come to the office on Wednesday and Saturday to get new jobs and drop off money or documents (credit card payments) from completed jobs.

¶ 14    On May 26, 2017, Mills met with the drivers. Daniels brought his crew with him, which included Mike Pierce, Mike Learn, and defendant. Daniels was going on vacation, and his crew was going to handle jobs while he was gone. Mills went over next week's jobs with the drivers. During the meeting, Daniels gave Mills approximately $3000 in cash.

¶ 15    Jouravleff, Mills' husband, returned home at some point, and the two went to bed about 9 p.m. Later, they were awoken by a tapping on their from door. Jouravleff ran downstairs, and Mills went to the bedroom window. She saw someone hiding in the bushes near her deck. She could not see what the person looked like, but noted he was wearing a dark colored coat that was "puffy" and "shiny." Mills tapped on the window, and she heard one of her dogs bark. Then, she heard gunshots, and someone ran up the stairs. She tried to call for help on the hallway phone, but someone came up behind her and took it from her. Mills was pushed into the bedroom. She observed that the person who pushed her was black. He had a green scarf covering much of his

face. The man held a gun to her head and told her to be still and she would be okay. Mills described the man's voice as "bluesy" and as "a black voice."

¶ 16    Mills told the man that she had money. The man yelled down the stairs and asked if the others had found the money. The man instructed Mills to show him where the money was. They walked downstairs. As they passed through the kitchen, Mills saw another man who also had a gun. The second man was small, white, and wore boots. They went to the basement, and Mills was directed to go into her office. Mills gave her money to the men, and, after threatening her further, they left. She heard the men running up the stairs, and the white man said, "[T]his is for Joey Z." Mills called 911.

¶ 17    Mills then went to Jouravleff. He was lying on his side in the foyer. His "eyes were fixed, and his mouth was slack open." She got a dish towel and attempted to apply pressure, but she was unsure where the bleeding was coming from. The police arrived first, and then paramedics did as well. Jouravleff was transported to the hospital, and he died that day.

¶ 18    Mills testified that at the time of the incident, she did not know Charles Campo, Jared Fox, or Byron Howard. She did not give defendant permission to be in her home the night of the incident. She identified a recording of a black man's voice, whom she said was the man who held her at gunpoint.

¶ 19    On cross-examination, she denied telling the police that the white man in the kitchen was taller than defendant. She did not tell detectives that the man she observed in her kitchen had a body type that was different than that of defendant. Jouravleff was only involved in Mills' moving business "[a] little bit."

¶ 20    Roy Daniels was the State's next witness. He stated that he worked for A Best Movers in May 2017. He was the lead driver. He contracted his own laborers. He knew Jouravleff. On May

26, 2017, he met with Mills at the company's office. He brought three individuals with him, including defendant. Daniels gave Mills about $3000 in the presence of defendant. At this time, defendant had been working for Daniels on-and-off for about a year. Defendant also worked for Joe Ronzio. On cross-examination, Daniels stated that defendant had worked for him on about 15 occasions and that he was happy with defendant's work.

¶ 21    The State then called Michael Learn. He testified that he is employed as a mover and driver. He had worked with Daniels for about five years. He had met Mills and Jouravleff a few times. They completed a job during the morning of May 26, 2017, and then went to the office. Defendant was present along with Daniels and Pierce. Defendant was driving a copper-colored Chevrolet Avalanche.

¶ 22    Michael Pierce then testified that he had worked for Daniels for about two months as of May 26, 2017. He and Learn arrived together. Pierce and defendant moved some furniture for Mills.

¶ 23    Jared Fox was the State's next witness. In May 2017, he was living in Wonder Lake. Byron Howard was his neighbor. Howard had moved in about six months earlier. He had met Charles Campo through friends. Sometimes, they worked together. Campo lived "right up the street from" Fox. Campo was living with his wife part of the time. Fox knew defendant as well. He met defendant through Campo. Defendant's nickname was "Bones," and his girlfriend's nickname was "Kat" (her full name is Kathy Scarbrough).

¶ 24    On May 26, 2017, Fox went to work, where they were pouring a driveway. He returned home that evening, and Campo stopped by. They had "a few beers." Defendant and his girlfriend stopped by after a few hours. They talked for a while. At one point, defendant stated that he had

been working for a moving company, and the company had not paid him for a couple of weeks. Howard came over.

¶ 25   Defendant left for a while and returned around 7 p.m. or 8 p.m. Fox stated that it might have been later. Fox added that defendant was talking "about going over to the guy's house and maybe collecting his money that he owed him." Defendant asked Fox if he would give defendant a ride to his employer's house. Fox declined. Defendant asked repeatedly, and Fox eventually agreed. Defendant stated that there was money that was owed to him and also that his employer had more money they could probably get. Defendant stated that he would take the money if he had to. Campo and Howard were present during these conversations. They all agreed to accompany defendant. Fox drove. Fox had a black Toyota extended cab pickup truck. The muffler leaked, and the truck was loud. Defendant gave Fox directions and instructed him where to park. They parked about a block away, and all four men walked to defendant's employer's house. Defendant asked Fox to knock on the door. Fox knocked, and the door began to open. Defendant and Howard immediately pushed their way past Fox and entered the house. Fox almost fell over a railing, and he ran away from the house. He heard two gunshots. Fox went back to his truck. Campo never approached the door and returned with Fox to the truck. Campo and Fox waited at the truck for 5 to 10 minutes. Howard and defendant returned and said, "let's get out of here." Fox drove back to his house. During the trip home, Fox was yelling, demanding to know what had happened. Defendant told him to keep his mouth shut. Defendant offered Fox some money, but Fox declined to accept it.

¶ 26   Fox saw defendant with a gun on the night of the incident. He added that defendant always carries a gun. Fox had his cell phone with him during the incident. He did not see Howard with a gun that evening. Fox's phone number was 815-403-6887. Subsequent to the incident, he permitted

the police to search his phone. The phone contained two contacts for defendant. Fox testified that defendant had two phones. Fox knew Kat's telephone number. Between a few days and a week after the incident, he received a message from Kat. About two weeks after the incident, the police came to Fox's house to speak to him, but he was not home. They spoke to Fox's mother, but they never returned. Fox was subsequently arrested.

¶ 27    Fox testified that he was in custody in the McHenry County jail at the time he testified. Pursuant to an agreement with the State, he was to cooperate in the prosecution of all of his co-offenders. In return, the State agreed to dismiss the murder charges against him, and he would plead guilty to the offense of aggravated battery with a firearm. He would receive a sentence of between six and eight years' imprisonment. The agreement required him to testify truthfully.

¶ 28    On cross-examination, Fox agreed that 10 counts of murder, 2 counts each of home invasion, armed robbery, and robbery, and a count of burglary would be dismissed in accordance with his deal with the State. The day after the incident, Fox went to work. He did not speak to the police before he was arrested on June 15, 2017. After he had been arrested and was being held in jail, Fox learned that defendant had been involved in a motorcycle accident, though he subsequently testified he was unsure when or how he learned this.

¶ 29    Detective Andrew Thomas, also of the McHenry County Sheriff's Office, was performing a traffic stop at about 1 a.m. on May 27, 2017, assisting a deputy. He confirmed the deputy "was all right" and responded to the crime scene. Upon arrival, he entered the residence and noted that the victim was unresponsive. He appeared to be bleeding from multiple gunshot wounds. He performed a gun-shot-residue test on Mills.

¶ 30    Officer Benjamin Brock of the McHenry County Sheriff's Office was assigned to the criminal investigation division on May 27, 2017. He arrived at the crime scene at 2:12 a.m. He

participated in a canvas of the neighborhood, during which he met Lynch. He also participated in a search of the residence.

¶ 31    Susan Ellis testified that, on May 27, 2017, she was a detective with the Cary Police Department assigned to the Major Investigations Assistance Team (MIAT). She was assigned to assist with the investigation in this case. During the early morning hours of May 27, 2017, she was directed to proceed to the McHenry Police Department. Ellis was partnered with Tiffany Decker. That morning, they were tasked with locating defendant and his girlfriend, Kathy Scarbrough (Kat). They went to a residence in McCullum Lake, where they encountered defendant. Defendant answered the door, and Ellis informed him that they were investigating an incident that occurred at Mills' residence. Defendant invited them in. Kat came downstairs near the end of the interview. Defendant described his visit to Mills' office the prior day. Defendant denied that he had been involved in stealing any money from Mills. When asked, defendant stated that he did not know anyone who drove a black truck. Defendant told the detectives that he and Kat had been to a meat raffle at a bar the night before. They stayed until 11 p.m., and got home at about midnight. Shortly after returning home, they went to sleep.

¶ 32    Later on May 27, 2017, Ellis and Decker drove to a campground in Wisconsin where Joe Ronzio was purportedly camping. They spoke to Ronzio about 9 p.m. On June 12, 2017, Ellis went to a Starbucks in the town of McHenry, where they met with an individual. Ellis was accompanied by Detective Russel Will. They had received an anonymous tip via Crime Stoppers that there was an individual who wanted to meet with them. They went out to talk in Will's unmarked car. The individual provided them with information about the offense at issue here. The individual identified two people involved in the crime.

¶ 33    On cross-examination, Ellis agreed that she was able to confirm that defendant and Kat were at a tavern for a meat raffle on May 26, 2017.

¶ 34    The State next called Christine Domaille. She owns the bar that held the meat raffle. She testified that she had known Kat for 10 or 12 years. The meat raffle started at 7:30 p.m. and finished about 9:30 p.m. Kat was present, accompanied by defendant. Domaille socialized with Kat after the raffle ended. She testified that defendant and Kat left about 10:30 p.m. On cross-examination, Domaille testified that defendant and Kat arrived at 7:20 p.m.

¶ 35    The State also called Charlie Campo. Campo testified that in May 2017, he was living in Wonder Lake. He knew Fox; they lived in the same neighborhood. Howard lived directly across the street from Fox with his girlfriend, Jennifer Meyer. He knew defendant, as they rode motorcycles together. Defendant was dating a woman called "Kat." He also knew defendant's brother, Steven Morris. In May 2017, Kat was driving an orangish-red Dodge Nitro. On May 27, 2017, Campo went to Fox's house. Howard was there, and defendant arrived later. Kat dropped defendant off. When defendant arrived, he was talking about a burglary. Defendant stated that "there was a lot of money involved." Defendant and Kat left. Howard, Fox, Campo, Meyer, Mariah (who was Campo's girlfriend) and Fox's girlfriend remained present. The group was drinking.

¶ 36    Later that night, Kat dropped defendant off again. Kat remained inside the car. She and defendant were arguing. Kat left. Defendant continued to discuss the burglary. When defendant returned, he was dressed in black. The group discussed the burglary and got gloves. They agreed not to use violence. They got in Fox's truck, which was black. As they were driving, Fox kept getting calls on his cell phone. He sent some to voicemail. When he answered, it was his girlfriend, who was mad at him for not being at home. They arrived at Mills' residence and approached on foot. Defendant told Fox to knock on the door. Howard, Fox, and defendant approached the door,

and Fox knocked. Campo remained by the side of the house. Campo heard a tap on a window and looked up. The door opened. Defendant "pushed Fox out of the way and ripped the screen door open." Campo then heard "a loud pop" (he later stated that he heard two pops). The door was forced open. Morris and Howard entered the house. Upon hearing the pops, Fox and Campo "took off." They walked past the truck and down the street; however, they saw someone walking a dog, so they turned back. They met back up with defendant and Howard and returned to the truck.

¶ 37    Campo testified that they then drove back to Fox's house, and they went across the street to Howard's house. Campo rode in the bed of the truck for part of the trip.  Defendant gave him $300. Campo spent the night at Howard's house. Howard and Campo burned their clothes. Campo never saw defendant carrying a gun that night.

¶ 38    Campo acknowledged that he had been charged with multiple counts of murder, home invasion, and burglary. In exchange for this testimony, he was being allowed to plead guilty to aggravated battery with a firearm and likely serve a sentence of 7 to 10 years. The agreement requires him to tell the truth. Campo further acknowledged that he had previously been convicted of robbery, arson, aggravated battery, criminal damage to property, and mob action. He had previously served time in prison.

¶ 39    On cross-examination, Campo testified that he initially stated that he did not want to participate in the burglary, but defendant told him to do so. Campo said he was sometimes afraid of defendant. Campo stated that during the commission of the offense, he was wearing a hoody. He was not wearing a shiny, puffy coat. He and Fox discussed the incident about 10 days after it occurred. They took their shirts off so that they could see that each of them was not wearing a wire. Campo acknowledged that without the plea deal, the minimum sentence he faced was 45 years' imprisonment and a life sentence was possible.

¶ 40    A day or two after the incident, Campo and Mariah met with defendant and Kat at Dusty's (it is unclear from the record what sort of establishment Dusty's is). They parked in the rear because they were "laying low." He acknowledged that he sometimes sold "weed" to defendant.

¶ 41    The State called Michael Morris, a parole agent with the Illinois Department of Corrections. He was defendant's parole agent in 2017. Defendant checked in using a telephone with the number 224-762-8063 in April 2017. On cross-examination, Morris agreed that defendant used two other numbers to check in between January 2, 2017, and June 5, 2017.

¶ 42    Russel Will, a Crystal Lake detective, performed a data extraction from Fox's cell phone. There was a contact in the phone for "Bones," with a phone number of 224-762-8063. On cross-examination, he testified that there was also a contact for "Bones new," phone number 779-713-9359, and "Bones watch" assigned to the number 224-281-6868.

¶ 43    David Mullen, an investigator with the McHenry County Sheriff's Department, testified that he participated in a search of the crime scene on May 27, 2017. He also documented the autopsy of the victim. On June 13, 2017, he participated in the execution of a search warrant at the residence where Howard lived. There was a burn pit in the backyard, which contained "quite a bit of charred material." There were also two black shoe insoles, which had not been burned. They recovered a shell casing from a 9mm bullet in the residence.

¶ 44    On June 15, 2017, Mullen accompanied other officers to the Fox Grove apartment complex in McHenry. They had received information that the firearm used in the offense at issue here was located in a dumpster at this location. From a black garbage bag, they recovered a Springfield XD-S 9mm handgun. In another such bag, they found a Taurus .22 caliber rifle. In a third bag, "they located an ammunition box that had an assortment of ammunition inside it."

¶ 45    The State also called Bonnie Morris. Bonnie is defendant's mother, and she has another son named Steven. She testified that in 2017, she drove a Copper-orange Chevrolet Avalanche. Kat and defendant were living with her in May 2017. Defendant was incarcerated on May 30 and May 31, 2017. Defendant called Bonnie from jail and asked her to take three garbage bags from the crawl space of their house to his brother Steve. Kat transported the bags to Steven.

¶ 46    Steven Morris then testified that he is defendant's brother and he knows Kat. In May 2017, Kat drove a red Dodge Nitro. On June 11, 2017, Kat brought two or three garbage bags to Steven. Steven put them in his garage. On June 12, 2017, he took the bags to a dumpster. On June 15, 2017, police officers showed up at Steven's home. He took them to that dumpster. The officers recovered the garbage bags. Steven testified that defendant was in the hospital from June 5, 2017, to June 16, 2017, following a motorcycle accident. Steven visited defendant in the hospital, and defendant asked him if he had gotten rid of the bags.

¶ 47    Kathy Scarbrough (Kat) next testified for the State. She stated that she and defendant are no longer dating. They started dating in June 2016, and they broke up in November 2018. In May 2017, she and defendant resided in Bonnie's house. In May and June 2017, her phone number was 815-790-1032. She knew, to varying degrees, Steven, Fox, Campo, and Howard. In May 2017, Kat owned two guns—a Springfield 9mm pistol and a rifle with an exchangeable barrel.

¶ 48    Kat stated that she had worked on May 26, 2017, a Friday. When she arrived home (she could not recall the time), defendant was already there. They were planning on attending a meat raffle at a bar owned by one of Kat's friends. They stayed at that bar until about 10 p.m. or 10:30 p.m. After leaving the bar, they drove to Fox's house. They intended to purchase some marijuana from Campo. A number of people were at the end of Fox's driveway. Kat remained in the car. She did not want to interact with a woman that Campo was cheating on his wife with. Defendant and

Kat got into an argument over this. Defendant told Kat to leave, and she drove down the road a few times and returned.

¶ 49   When she returned the second time, she could hear the group talking about going after a drug dealer. She added, "It was mostly Charlie going crazy" and Fox "was more like the lost puppy following." Further, Howard "was a little, like, into it, but more stoic than the rest." Regarding defendant, Kat testified, "And [defendant] is like—I don't know how to describe him because, I'm going to be honest, that night, he was different than I have ever seen him." She clarified, "I had never seen him aggressive." She asserted that defendant had never laid a hand on her except that night, when, during their argument, he grabbed her vest. Kat stated that they argued further, and then she left and went home. Defendant called and apologized. She returned later and picked up defendant; he was standing in the street alone when she picked him up. Defendant was quiet. They got home about 1:35 a.m.

¶ 50   On June 15, 2017, Kat met with two female police officers. She accompanied them to the hospital where defendant was admitted following his June 5 motorcycle accident. Kat agreed to allow them to secretly record a conversation between her and defendant. A recording of the conversation was played for the jury. In it, defendant states that Kat need not worry because she and defendant had nothing to do with the incident. Defendant stated he would never kill anyone over money. Defendant claimed that on the night of May 27, 2017, he stayed at Fox's house with Campo while Howard and Fox left. Defendant stated that only Campo had a gun on the night of the incident. Defendant told Kat that she had thrown him "under the bus" when she told the police she had left him at Fox's house for an hour. Defendant asked her to recant and say that she had only left him there for 15 minutes, explaining that he needed "an alibi too." Defendant reiterated that he did not "do it."

¶ 51    Prior to defendant being admitted to the hospital, he and Kat had several conversations. Defendant was upset about something, but would not tell her what had happened. Defendant mentioned suicide. At one point, defendant stated that a guy had pulled a gun on him, and "we shot him." While defendant was in jail (on a parole hold) in early June 2017, he contacted Kat about moving the garbage bags in the crawl space at Bonnie's house.

¶ 52    Kat stated that she was interviewed by the police on three occasions: May 31, 2017, June 13, 2017, and June 15, 2017. She acknowledged that she "came close to being charged with obstruction." This was based on her denial, on June 13, of knowing where the guns were. Kat stated that she still loved defendant and did not want anything bad to happen to him. She said she would do anything she legally could to help him.

¶ 53    The State next called Dr. Mark Witeck, a forensic pathologist. The trial court accepted Witeck an expert in the field of forensic pathology. He performed the autopsy of Jouravleff on May 30, 2017. He noted three gunshot wounds. He opined that the gunshot wounds were the cause of Jouravleff's death.

¶ 54    Detective George Kopulos, Jr., testified for the State that, in May 2017, he was a detective for the city of Woodstock assigned to MIAT. On May 29, 2017, he was part of a neighborhood canvas in the area of the crime scene. He collected a number of cigarette butts. On May 31, 2017, he met with Kat. Kat gave him permission to search her cell phone. He checked the phone's location history on its mapping program and noted "some inconsistencies with the story she was giving us and the timeline her phone showed." On cross-examination, Kopulos testified that he was not aware what had become of the cigarette butts he recovered. However, he explained, he was reassigned to another case on June 15, 2017.

¶ 55 The State then called Michelle Asplund of the McHenry County Sheriff's Department. In May 2017, she was a detective and a member of MIAT. At about 1 a.m. on May 27, 2017, she was assigned to interview Mills at the hospital where the victim had been taken. She went to the victim's room in the emergency department. The victim was unconscious. Asplund then met with Mills. Also present were Mills' sister, friend, and two daughters. Mills was very emotional, but cooperative. On June 12, 2017, Asplund met with Mills at her home. She played a recording of Howard's voice for Mills, and Mills recognized it. Mills obtained records from Verizon regarding a cell tower in the area of the crime scene. The records showed a call that occurred at 1.a.m. on May 27, 2017, from (224) 762-8063 to (815) 403-6887. The latter belonged to Fox; the former did not have a registered user. The latter number appeared as a contact in Fox's phone under the name "Bones" (earlier, Fox had testified that defendant's nickname was "Bones"). Asplund also obtained data from Kat's phone and records from Verizon concerning the usage of the phone with the number (224) 762-8063. Kat's phone had the third highest degree of traffic with the unregistered phone. This phone called Kat's phone at 1:27 a.m. on May 27, 2017. In several text messages from her phone to the unregistered phone, Kat "says 'Adam' numerous times" and also says "I love you." The user of the unregistered phone replies " 'love you too' [and] things like that numerous times." At the time of these messages, Kat and defendant were dating.

¶ 56 Andrew Thomas was then recalled by the State. He performed an analysis of cell phone data obtained from Verizon concerning usage of six cellphone towers. He was asked to analyze the records concerning two cell phone numbers: (224) 762-8063 (the unregistered phone) and (815) 403-6887 (Fox's phone). He located a record of a call made from the unregistered phone to Fox's phone. The call was made at 1:00:19 a.m. on May 27, 2017, and lasted 21.8 seconds. The call was initiated through cell tower number 178, which is located at 2110 West Wright Road in

McHenry (which is less than a third of a mile from the crime scene). The records further indicated that the call was routed through an antenna on the cell tower that handled cell traffic from the southeast and that the initiating phone was 0.3 miles from the tower (with a margin of error of 0.1 miles). Verizon also recorded data concerning the latitude and longitude of the call; however, it "indicates a medium confidence" and "has not been found to be reliable as a pinpoint location." It gives only a general location. Using this information, Thomas plotted where the unregistered phone would have been when the call was initiated.

¶ 57    On cross-examination, Thomas conceded that his analysis had not been peer reviewed, which was a deviation from applicable standards. He further agreed that he could not say who was using the phone when the call was made at 1 a.m. on May 27, 2017.

¶ 58    The State's next witness was Ellen Chapman. She stated that she was a forensic scientist with the Illinois State Police Forensic Center. Chapman examined the gunshot residue kit taken from Mills. Four samples were taken. Chapman testified that all four tested positive. She explained that a person could come into contact with gunshot residue by touching a person who had been shot.

¶ 59    The State also called Blake Aper, a forensic scientist with the Illinois State Police Crime Laboratory. He works in the biology and DNA section. Aper tested the Springfield 9mm pistol the police recovered from the dumpster. He collected a sample that was a mixture of two individuals' DNA. Defendant could not be excluded from having contributed to the mixture; however, Jouravleff, Mills, Fox, Howard, and Campo all could be excluded. He further testified that 74% of the population also could not be excluded. On cross-examination, Aper acknowledged that he could not tell when or how a DNA sample was deposited upon an item. An individual wearing gloves might not leave any genetic material behind. He agreed that other DNA samples recovered

from other places did not match any of the individual known to be involved in this case. Aper recovered DNA from a cigarette butt that belonged to an individual that Aper was able to identify using an FBI database. Aper did not determine if this individual could be excluded from having contributed to the sample taken from the Springfield 9mm pistol.

¶ 60   Edward Rottman, a fingerprint examiner with the Illinois State Police Crime Laboratory, was called by the State next. He examined shell casings recovered at the crime scene for latent fingerprints and could not find any. He examined various other items, including a business card, a dime, a phone, and a number of fingerprint lifts from the crime scene. He found no latent prints suitable for comparison. He recovered suitable prints from a cash drawer, which belonged to neither Jouravleff nor Mill. It also did not match defendant, Howard, Fox, or Campo. A latent print lifted from the crime scene similarly matched none of these individuals. This was true of a number of lifts. Two other lifts matched Mills. Finally, Rottman found one of defendant's fingerprints on the left side of the slide of the Springfield 9mm pistol. On cross-examination, he agreed that an individual wearing a glove would not leave a fingerprint.

¶ 61   The State's next witness was Julie Steele, also a forensic scientist with the Illinois State Police Crime Laboratory. She stated that she is a firearm examiner. She fired six test shots from the Springfield 9mm pistol recovered from the dumpster. She recovered the bullets and gave them to Christina Davison.

¶ 62   Davison then testified that she is a forensic scientist specializing in firearm identification. She is employed at the Illinois State Police Forensic Science Laboratory in Rockford. She examined the firearm recovered from the dumpster, which she identified as a Springfield XDS. She could not determine whether or not two bullets recovered at the crime scene were fired from this gun. However, two shell casings recovered at the crime scene were, in fact, fired from the

Springfield 9mm pistol. On cross-examination, Davison agreed that she concluded that the casings were fired from the Springfield 9mm pistol by making a visual inspection. It was her "eyes making this call." She admitted that there was "no electronic or computer algorithm that aid[ed her]."

¶ 63    The State then rested, and defendant called James Blauw. Blauw testified that he is a concrete worker. Fox worked for him in June 2017 at King Concrete. On June 13, 2017, Blauw drove Fox to work in Blauw's personal vehicle. They had "a conversation about what [Fox] had been doing on May 26th and 27th, 2017." During that conversation, Fox told Blauw that defendant had been involved in a motorcycle accident. That was the last day Blauw and Fox worked together. On cross-examination, Blauw stated that he had known Fox since he was born and that he had worked with Fox's father before his death.

¶ 64    Defendant next called Thomas Freeman. Freeman testified that he was serving a 20-year sentence for residential burglary. On April 28, 2018, he was in the McHenry County jail on a parole violation. He had a conversation with Campo. Defense counsel asked what Campo had told him, and the State objected, citing hearsay. Defense counsel responded that Campo's testimony was admissible because he was a party opponent, but the trial court sustained the objection.

¶ 65    Defendant then made an offer of proof as to what Freeman would testify to. Defense counsel related that Freeman would testify that Campo attempted to solicit "Freeman to hurt or injure or kill Kat." Campo told Freeman that he would arrange to have $1000 paid to Freeman. The court continued to sustain the State's hearsay objection.

¶ 66    Defense counsel then addressed the proposed testimony of Shane Perry, whom defendant intended to call next. Perry would testify that he had a conversation with Howard in the McHenry County jail concerning the death of Jouravleff. Perry would testify that Howard told him that Fox, Howard, and Campo were involved in the crime and that Howard never mentioned defendant.

Perry would further testify that he had a conversation with Campo on May 26, 2017. Campo told Perry he would soon be able to repay Perry $300. Campo paid Perry this sum the next day and told Perry that he had been "doing the devil's work." The State asserted that both conversations constituted hearsay. It also contended that testimony that Campo paid Perry $300 was not relevant. Defendant countered that Campo's statements to Perry were statements against his interest. The trial court sustained the State's objection to Perry's proposed testimony. Defendant then informed the court that, based on its rulings, defendant had no further witnesses.

¶ 67    The jury acquitted defendant of intentional first-degree murder, but convicted him of knowing first-degree murder and first-degree felony murder. It also convicted him of armed robbery, burglary, and unlawful possession of a weapon by a felon while acquitting him of home invasion. The trial court noted, "The firearm interrogatories were not signed by the jurors." Defendant was then sentenced to consecutive prison terms of 38 years (knowing murder), 26 years (armed robbery), and 7 years (burglary) as well as a concurrent sentence of 4 years (unlawful possession of a weapon by a felon). The trial court found that one-act, one-crime principles (*People v. Artis*, 232 Ill. 2d 156, 161 (2009)) precluded a sentence for the felony-murder conviction.  This appeal followed.

¶ 68                                III. ANALYSIS

¶ 69    Defendant raises two primary issues. First, he contends that the trial court erred in excluding as hearsay testimony that would have supported his claim that he did not participate in the offense. Second, defendant argues that the jury's verdict of guilty of first-degree murder is inconsistent with its failure to find that he personally discharged a firearm during the crime. We find neither argument well taken.

¶ 70                                A. HEARSAY

¶ 71    During his portion of the case, defendant sought to introduce the testimony of Shane Perry. Perry would testify that he had a conversation with Howard in the McHenry County jail and that Howard told him that Fox, Howard, and Campo were involved in the offense, but Howard never mentioned defendant. The trial court found that this was inadmissible hearsay. Defendant argues that the trial court should have allowed this testimony as a statement against interest. Defendant correctly states that the abuse-of-discretion standard applies here. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133 ("[W]hen a party claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, the standard of review is abuse of discretion."). Accordingly, we will reverse only if no reasonable person could agree with the trial court's decision. *Id.* ¶ 134. Finally, "the trial court's ruling will not be overturned unless the abuse of that discretion led to manifest prejudice against defendant." *Id.*

¶ 72    Before proceeding further, we note that this testimony would not be admissible in accordance with Illinois Rule of Evidence 804(b)(3) (eff. January 1, 2011). That rule requires that the declarant be unavailable. *Id.* It defines "unavailability" as "situations in which the declarant":

"(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or

(2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or

(3) testifies to a lack of memory of the subject matter of the declarant's statement; or

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means." Howard was never called as a witness or refused to testify; he never invoked any privilege and the trial court made no ruling on the existence of one. There is no indication that Howard was "unable to be present" for any reason or that he was unavailable for any other reason articulated in Rule 804(b)(3). Accordingly, Rule 804(b)(3) has no application here.

¶ 73    Instead, defendant seeks to invoke federal due process doctrine, specifically, *Chambers v. Mississippi*, 410 U. S. 284, 302 (1973), and its progeny. In *Chambers*, the United States Supreme Court held that, in appropriate circumstances, due process might mandate the admission of evidence that would otherwise be excluded by a mechanistic application of state evidentiary law. *Id.* at 302. However, "*Chambers* did not do away with the hearsay rule." *People v. Tenney*, 205 Ill. 2d 411, 435 (2002) (quoting *Lee v. McCaughtry*, 933 F.2d 536, 538 (7th Cir. 1991)). Rather, it provides an alternate basis for the admission of evidence where due process requires. See *People v. Rice*, 166 Ill. 2d 35, 43 (1995) (discussing the relationship between *Chambers* and Federal Rule of Evidence 804(b)(3), upon which the Illinois rule was modeled, our supreme court stated, "Because we find that codefendant's suppression hearing testimony would be inadmissible under either *Chambers* or Rule 804(b)(3), we need not address the State's initial argument that the appellate court erroneously adopted the [federal] rule.").

¶ 74    Accordingly, we must examine *Chambers*. Generally, an extrajudicial admission by a declarant that the declarant committed the crime that a defendant is on trial for is hearsay. *People v. Anderson*, 367 Ill. App. 3d 653, 664-65 (2006). The statement-against-penal-interest exception to the hearsay rule allows the admission of such a statement if it exhibits "objective criteria of

trustworthiness." *Id*. In *Chambers*, the Supreme Court set forth a non-exclusive list of four factors to consider in ascertaining whether due process required the admission of a statement of this sort. Those factors are as follows: "(1) the statement was spontaneously made to a close acquaintance shortly after the crime occurred; (2) the statement is corroborated by some other evidence; (3) the statement is self-incriminating and against the declarant's interests; and (4) there was adequate opportunity for cross-examination of the declarant." *Tenney*, 205 Ill. 2d at 435 (citing *Chambers*, 410 U.S. at 300-01). All four factors need not be present for a statement to be admissible. *Tenney*, 205 Ill. 2d at 435. Conversely, "[j]ust as all four factors are not *necessary* to establish a statement's trustworthiness, the existence of one or more of the factors is not necessarily *sufficient* to establish a statement's trustworthiness." *Anderson*, 367 Ill. App. 3d at 664-65. These four factors are "guidelines," and "the question to be considered in deciding the admissibility of such an extrajudicial statement is whether it was made under circumstances which provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *Tenney*, 205 Ill. 2d at 435 (quoting *People v. Thomas*, 171 Ill. 2d 207, 216 (1996)).

¶ 75    Regarding the first factor, whether the statement was spontaneously made to a close acquaintance shortly after the crime occurred (*Tenney*, 205 Ill. 2d at 435), the record reveals neither when Howard purportedly described the crime to Perry nor the relationship between Howard and Perry beyond that they knew each other from being in the McHenry County jail. Hence, the first factor would weigh against the admission of this testimony.

¶ 76    Next, the second factor is whether the statement is corroborated by some other evidence. *Tenney*, 205 Ill. 2d at 435. Defendant points to Campo's and Fox's testimony that they participated in the crime. This corroborates Perry's proposed testimony to the extent Howard allegedly told him that Campo and Fox were involved in the offense. However, the salient point of Perry's

testimony, according to defendant, was that Howard never told Perry that defendant was involved. Both Campo and Fox testified to defendant's participation in the offense. Their involvement in the crime was not in dispute. Thus, their testimony did not corroborate Perry's testimony in the manner that defendant asserted it was relevant to this case. As only a matter collateral to the purpose for which the statement was material was corroborated by Camp and Fox, the trial court could reasonably place diminished weight on this factor. See *People v. Swift*, 61 Ill. App. 3d 486, 493 (1978). Defendant also points to the testimony of Reiter who stated that he saw three individuals walking toward the crime scene at approximately the time of the incident. However, Reiter was unable to identify anyone in a lineup, and he also testified that the three individuals were all white. Since Howard is black, this provides no corroboration for the proposition that Howard, Campo, and Fox participated in the crime without defendant.

¶ 77    Undoubtedly, Howard's purported statement was against his penal interests. This leaves the fourth factor, whether Howard was available for cross-examination. *Tenney*, 205 Ill. 2d at 435. Defendant acknowledges that Howard was not available for cross-examination. Howard was yet to stand trial for his role in the offense, so it is reasonable to suppose that he would have invoked his fifth amendment privilege against self-incrimination. *Cf. People v. Edwards*, 2012 IL 111711, ¶ 38 ("No amount of diligence could have forced [the codefendant] to violate [his fifth amendment] right if he did not choose to do so."). Thus, the fourth factor militates against the admission of Perry's testimony about Howard's alleged statement.

¶ 78    Defendant correctly points out that "the declarant's unavailability does not render the statement unreliable or inadmissible." *Tenney*, 205 Ill. 2d at 439. Indeed, as defendant notes, in *Tenney*, our supreme court found a hearsay statement sufficiently reliable to be admitted despite the fact that two of the four factors set forth in *Tenney* were not satisfied. *Id*. at 438-41. However,

the *Tenney* court also found that the "unique and rare circumstances surrounding" the case provided an "additional *indicium* of reliability." *Id.* at 439. Specifically, the State had used the hearsay statement it now sought to exclude in the earlier prosecution of a different individual, Lane, for the murder the defendant was being tried for. *Id.* at 431. Lane had been convicted of the murder and had allegedly confessed to an inmate in prison. *Id.* at 423. Lane's conviction was vacated when the defendant was charged with the offense. *Id.* at 431. The *Tenney* court found it would be " 'shocking to all sense of justice' " to apply the hearsay rule to exclude evidence that the State had successfully used in a prior prosecution. *Id.* at 440 (quoting *People v. Letttrich*, 413 Ill. 172, 178 (1952)). These unique circumstances are simply absent here. *Tenney* is distinguishable on this basis.

¶ 79    Here, the first and fourth factors weigh against finding that Howard's alleged statement to Perry is admissible. However, the statement is clearly self-incriminating, so the third factor weighs in favor of admission. Regarding corroboration, some exists, but, as explained above, the trial court could reasonably place diminished weight on this factor given the nature of the corroboration. Given the relative balance of these considerations, we simply cannot say that the trial court abused its discretion—*i.e.*, that no reasonable person could agree with the trial court.

¶ 80    Furthermore, even assuming, *arguendo*, that error occurred here, we have difficulty seeing how it could be anything but harmless. As defendant's argument implicates due process, it is of constitutional magnitude, hence, the error can only be deemed harmless if it is harmless beyond a reasonable doubt. *People v. White*, 2017 IL App (1st) 142358, ¶ 31. Initially, we note that the statement Perry attributed to Howard did not truly exculpate defendant. That is, Howard reportedly described the offense without making reference to defendant; he did not directly state that defendant was not involved. In *People v. Allen*, 377 Ill. App. 3d 938, 944 (2007), the court held

that the absence of DNA evidence on a gun would not exonerate the defendant as the failure to find a DNA sample would not conclusively establish that the defendant did not handle the gun. Similarly here, Howard's failure to mention defendant does not establish that defendant was not involved in the crime.

¶ 81 Against this ambiguous statement is a mountain of evidence establishing defendant's participation in the offense. Fox and Campo both testified to defendant's involvement. Kat testified that defendant directed her to get rid of some garbage bags in the crawl space of defendant's mother's house. Kat, Bonnie, and Steven described their efforts to get rid of those bags. Those bags were later recovered by the police and found to contain a Springfield 9mm pistol. Davison, a forensic scientist, testified that shell casings recovered at the crime scene were fired from that gun. Defendant's fingerprint was found on the gun. DNA profiles were recovered from the gun. Defendant could not be excluded from having contributed to the DNA profiles, but Fox, Howard, Campo, Jouravleff, and Mills all could be excluded. A call from a cell phone was routed through a cellular tower in the neighborhood of the crime at about the time the crime occurred, and there was evidence linking to defendant to that phone. Mills did not know Campo, Fox, or Howard; however, she knew defendant and defendant had been to her home previously. Mills exchanged cash with another employee in defendant's presence in the basement of the home earlier on the day of the murder. In light of all of this evidence, we are compelled to hold that no reasonable doubt exists that the alleged statement made by Howard, had it been admitted, would have led to a different result.

¶ 82 In sum, we find no error here, and even if an error arguably occurred, it was harmless beyond a reasonable doubt.

¶ 83               B. INCONSISTENT VERDICTS

¶ 84     Defendant next argues that his conviction for first-degree murder is inconsistent with the jury failing to find that he personally discharged a firearm for the purposes of a sentencing enhancement. As charged, the first-degree murder count of which defendant was convicted alleged that defendant "shot Donald Jouravleff with a firearm knowing such act created a strong probability of death or great, bodily harm to Donald Jouravleff, thereby causing the death of Donald Jouravleff, and during the commission of the offense the defendant personally discharged a firearm that proximately caused the death of another." Regarding the firearm enhancement, the jury was instructed, "If you find from your consideration of all the evidence that, if during the commission of the offense, Adam Morris personally discharged a firearm that proximately caused the death of Donald Jouravleff beyond a reasonable doubt, then you should sign below." The jury did not sign the latter interrogatory. Defendant points out that the State did not argue that defendant was guilty on an accountability theory, and the jury was not instructed regarding one. Whether verdicts are legally inconsistent presents a question of law subject to *de novo* review. *People v. Price*, 221 Ill. 2d 182, 189 (2006).

¶ 85     Before proceeding further, we note that the State asserts that defendant forfeited this issue by failing to interpose a contemporaneous objection. Defendant points out that this issue was included in his post-trial motion and that any objection to the jury's verdict would have come post-trial in any event. Moreover, defendant notes that his issue has been routinely addressed under the second prong of the plain-error analysis. See, *e.g.*, *People v. Bennett*, 329 Ill. App. 3d 502, 515 (2002). Regardless, we must first ascertain whether any error occurred before considering whether it rises to the level of plain error. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). As we determine no error occurred, we need not consider the plain-error doctrine any further.

¶ 86    Defendant acknowledges that significant precedent adverse to his position exists. In *People v. Jones*, 207 Ill. 2d 122, 130 (2003), our supreme court elected to follow the United States Supreme Court's decision in *United States v. Powell*, 469 U.S. 57, 63 (1984), which held that "consistency in the verdicts is not required as a matter of constitutional law and that inconsistent verdicts can often be explained as a product of juror lenity." The *Powell* Court further noted that where verdicts are inconsistent, it is unclear which side has benefited and that a defendant was still protected from a wrongful conviction because he or she retained the ability to challenge the sufficiency of the evidence. *Powell*, 469 U.S. at 465-67. *Powell* relied on *Dunn v. United States*, 284 U.S. 390, 391-94 (1932), which had rejected an inconsistent-verdict argument where the defendant was convicted of "maintaining a common nuisance by keeping for sale at a specified place intoxicating liquor," but acquitted of "unlawful possession of intoxicating liquor" as well as "for the unlawful sale of such liquor." Our supreme court held, "Defendants in Illinois can no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges." *Jones*, 207 Ill. 2d at 133-34.

¶ 87    Defendant counters that the instant case does not involve a conviction and an acquittal on two separate charges. Rather, defendant asserts that the jury's failure to find that he personally discharged a firearm was, in essence, a finding on a special interrogatory. Defendant acknowledges that a similar argument has been rejected by two other districts of this appellate court.

¶ 88    In *People v. Alexander*, 2017 IL App (1st) 142170, ¶ 32, the defendant was convicted of first-degree murder and, as in this case, the jury did not find pursuant to a special interrogatory that the defendant personally discharged a firearm. The defendant argued that "it would be nonsensical and unfair to allow him to be convicted as the principal shooter in a murder but found not to have personally discharged said firearm." *Id.* ¶ 37. The first district responded, "While it

may seem nonsensical to allow the above situation to occur, both the Illinois Supreme Court and the United States Supreme Court have stated that such an occurrence does not offend the constitution and such convictions can stand." *Id.* ¶ 38; see also *Powell*, 469 U.S. at 64-65; *Jones*, 207 Ill. 2d at 133-34. Accordingly, the court rejected the defendant's challenge. *Id.*

¶ 89    Defendant criticizes *Alexander* as an unwarranted extension of *Powell*, *Dunn*, and *Jones*. He asserts, "*Alexander* was wrongly decided because there is an important distinction between *Dunn*, *Powell*, and *Jones* and the instant matter: the former cases all involved independent counts and crimes, not a special allegation pleaded as part of a single count." While this is certainly a distinction, we cannot say that it is a material one. Quite simply, many of the same policy considerations underlying *Powell* and cited in *Jones* are present here. First, the different outcomes in this case could be the result of lenity. See *Jones*, 207 Ill. 2d at 130. Second, it is not clear whether it was defendant or the State that benefitted from this purported inconsistency—it is possible that the proper, consistent outcome would have been that defendant was convicted and the sentencing enhancement applied. See *Id*. Third, defendant could have challenged the sufficiency of the evidence if he believed he had been wrongfully convicted. See *Id.* at 131. Contrary to defendant's position, *Dunn*, *Powell*, and *Jones* provide sound support for the First District's holding in *Alexander*.

¶ 90    Also of note here is the Fourth District's decision in *People v. Reed*, 396 Ill. App. 3d 636 (2009). In that case, a jury convicted the defendant of first-degree murder but did not find in accordance with a special interrogatory that the defendant had personally discharged a firearm such that a sentencing enhancement applied. *Id.* at 645. The *Reed* court held that "no law exists establishing an inconsistent answer to a special interrogatory trumps the verdict in criminal cases." *Id.* at 646. Moreover, the court added, the rationale behind *Powell* "would also apply to

inconsistencies between a verdict and a special interrogatory like the one at issue here." *Id.* at 647. It ultimately concluded, "[A] guilty verdict cannot be challenged based on an inconsistent answer to a special interrogatory absent a statute providing such." *Id.* at 648. Defendant counters that interrogatories were used at common law. While this might undercut the rationale of *Reed* regarding the necessity of a statute authorizing such an interrogatory, it in no way undermines its core holding that "no law exists establishing an inconsistent answer to a special interrogatory trumps the verdict in criminal cases" (*Id.* at 646), which tracks cases like *Dunn*, *Powell*, and *Jones*.

¶ 91 Another case that is on point is *People v. Ware*, 2019 IL App (1st) 160989, where yet another defendant was convicted of first-degree murder while the jury failed to find that the defendant had personally discharged a firearm, again for the purpose of a sentencing enhancement. The First District held, "It makes no legal difference that the inconsistency is between a charge and an enhancement instead of a charge and another charge, even where one appears dependent on the other." However, Justice Walker, joined by Presiding Justice Mikva, specially concurred. The special concurrence agreed that the majority opinion was mandated by the supreme court's holding in *Jones*. *Ware*, 2019 IL App (1st), ¶ 60 (Walker, J., specially concurring). It expressed concern that "we, as judges, are directed to allow inconsistent verdicts to stand in criminal cases, where the standard is proof beyond a reasonable doubt, while we are also directed to strike down verdicts that are inconsistent with a jury's response to a special interrogatory in civil cases, where the standard is a mere preponderance of the evidence." *Id.* ¶ 62. It questioned whether it was time to re-examine the issue. *Id.* 65. Of course, as we are bound by decisions of the supreme court like *Jones* (*Gatreaux v. DKW Enterprises, LLC*, 2011 IL App (1st) 103482, ¶ 23), we are unable to undertake such a re-examination.

¶ 92    To conclude, we reject defendant's argument on this issue. Controlling supreme court authority as well as the weight of authority from other appellate districts compel this conclusion. Defendant's attempts to distinguish these cases are unpersuasive.

¶ 93                                    IV. CONCLUSION

¶ 94    In light of the foregoing, the judgment of the circuit court of McHenry County is affirmed.

¶ 95    Affirmed.